Filed 12/29/11

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| CALIFORNIA REDEVELOPMENT ASSOCIATION et al., | ) ) ) | |
| Petitioners, | ) ) ) | S194861 |
| v. | ) ) | |
| ANA MATOSANTOS, as Director, etc., et al., | ) ) ) | |
| Respondents; | ) ) | |
| COUNTY OF SANTA CLARA et al., | ) ) | |
| Interveners and Respondents. | ) ) | |

Responding to a declared state fiscal emergency, in the summer of 2011 the Legislature enacted two measures intended to stabilize school funding by reducing or eliminating the diversion of property tax revenues from school districts to the state's community redevelopment agencies. (Assem. Bill Nos. 26 & 27 (2011-2012 1st Ex. Sess.) enacted as Stats. 2011, 1st Ex. Sess. 2011-2012, chs. 5-6 (hereafter Assembly Bill 1X 26 and Assembly Bill 1X 27); see also Assem. Bill 1X 26, § 1, subds. (d)-(i); Assem. Bill 1X 27, § 1, subds. (b), (c).) Assembly Bill 1X 26 bars redevelopment agencies from engaging in new business and provides for their windup and dissolution. Assembly Bill 1X 27 offers an alternative: redevelopment agencies can continue to operate if the cities and counties that

1

created them agree to make payments into funds benefiting the state's schools and special districts.

The California Redevelopment Association, the League of California Cities, and other affected parties (collectively the Association) promptly sought extraordinary writ relief from this court, arguing that each measure was unconstitutional. They contended the measures violate, inter alia, Proposition 22, which amended the state Constitution to place limits on the state's ability to require payments from redevelopment agencies for the state's benefit. (See Cal. Const., art. XIII, § 25.5, subd. (a)(7), added by Prop. 22, as approved by voters, Gen. Elec. (Nov. 2, 2010).) The state's Director of Finance, respondent Ana Matosantos, opposed on the merits but agreed we should put to rest the significant constitutional questions concerning the validity of both measures.[1] We issued an order to show cause, partially stayed the two measures, and established an expedited briefing schedule. We also granted leave to the County of Santa Clara and its auditor-controller, Vinod K. Sharma (collectively Santa Clara), to intervene as respondents.

We consider whether under the state Constitution (1) redevelopment agencies, once created and engaged in redevelopment plans, have a protected right to exist that immunizes them from statutory dissolution by the Legislature; and (2) redevelopment agencies and their sponsoring communities have a protected right not to make payments to various funds benefiting schools and special districts as a condition of continued operation. Answering the first question "no"

---

[1] Two other respondents, state Controller John Chiang and Alameda County Auditor-Controller Patrick O'Connell, who was sued on behalf of a putative class of county auditor-controllers, took no position on the merits. All respondents have been sued in their official capacities.

and the second "yes," we largely uphold Assembly Bill 1X 26 and invalidate Assembly Bill 1X 27.

Assembly Bill 1X 26, the dissolution measure, is a proper exercise of the legislative power vested in the Legislature by the state Constitution.  That power includes the authority to create entities, such as redevelopment agencies, to carry out the state's ends and the corollary power to dissolve those same entities when the Legislature deems it necessary and proper.  Proposition 22, while it amended the state Constitution to impose new limits on the Legislature's fiscal powers, neither explicitly nor implicitly rescinded the Legislature's power to dissolve redevelopment agencies.  Nor does article XVI, section 16 of the state Constitution, which authorizes the allocation of property tax revenues to redevelopment agencies, impair that power.

A different conclusion is required with respect to Assembly Bill 1X 27, the measure conditioning further redevelopment agency operations on additional payments by an agency's community sponsors to state funds benefiting schools and special districts.  Proposition 22 (specifically Cal. Const., art. XIII, § 25.5, subd. (a)(7)) expressly forbids the Legislature from requiring such payments.  Matosantos's argument that the payments are valid because technically voluntary cannot be reconciled with the fact that the payments are a requirement of continued operation.  Because the flawed provisions of Assembly Bill 1X 27 are not severable from other parts of that measure, the measure is invalid in its entirety.[2]

---

[2]    Amicus curiae City of Cerritos et al. raises additional constitutional arguments against the validity of Assembly Bills 1X 26 and 1X 27 based on provisions neither raised nor briefed by the parties.  We do not consider them.

3

# I. BACKGROUND

### A. *Government Finance: The Integration of State, School, and Municipal Financing*

For much of the 20th century, state and local governments were financed independently under the "separation of sources" doctrine. In 1910, the Legislature proposed, and the voters approved, a constitutional amendment granting local governments exclusive control over the property tax. (Cal. Const., art. XIII, former § 10, enacted by Sen. Const. Amend. No. 1, Gen. Elec. (Nov. 8, 1910); see Simmons, *California Tax Collection: Time for Reform* (2008) 48 Santa Clara L.Rev. 279, 285-286; Ehrman & Flavin, Taxing Cal. Property (4th ed. 2011) §§ 1:9-1:10, p. 1-14.) Each jurisdiction (city, county, special district, and school district) could levy its own independent property tax. (See, e.g., *Temescal Water Co. v. Niemann* (1913) 22 Cal.App. 174, 176 ["It is conceded . . . that a municipality has the right to assess all real property found within its limits for the purpose of maintaining the municipal revenues, and that the county taxing officials have the right to levy upon the same property for county purposes."].)

This system of finance had significant consequences for education. Under the state Constitution, the Legislature is obligated to provide for a public school system. (Cal. Const., art. IX, § 5; *Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1195.) Seeking to promote local involvement, the Legislature established school districts as political subdivisions and delegated to them that duty. (*Wells*, at p. 1195; *Butt v. State of California* (1992) 4 Cal.4th 668, 680-681; see also *California Teachers Assn. v. Hayes* (1992) 5 Cal.App.4th 1513, 1523.) Historically, school districts were largely funded out of local property taxes. (*Serrano v. Priest* (1971) 5 Cal.3d 584, 592 (*Serrano I*); *Serrano v. Priest* (1976) 18 Cal.3d 728, 737-738 (*Serrano II*); see *County of Los Angeles v. Sasaki* (1994) 23 Cal.App.4th 1442, 1450.) Under the California system of financing as it

existed until the 1970's, different school districts could levy taxes and generate vastly different revenues; because of the difference in property values, the same property tax rate would yield widely differing sums in, for example, Beverly Hills and Baldwin Park. (*Serrano I*, at pp. 592-594.)

We invalidated that system of financing in *Serrano I* and *Serrano II*, holding that education was a fundamental interest (*Serrano I*, *supra*, 5 Cal.3d at pp. 608-609; *Serrano II*, *supra*, 18 Cal.3d at pp. 765-766) and that financing heavily dependent on local property tax bases denied students equal protection (*Serrano I*, at pp. 614-615; *Serrano II*, at pp. 768-769, 776). The *Serrano* decisions threw "the division of state and local responsibility for educational funding" into " 'a state of flux.' " (*Los Angeles Unified School Dist. v. County of Los Angeles* (2010) 181 Cal.App.4th 414, 419.) In their aftermath, a "Byzantine" system of financing (*California Teachers Assn. v. Hayes*, *supra*, 5 Cal.App.4th at p. 1525) evolved in which the state became the principal financial backstop for local school districts. Funding equalization was achieved by capping individual districts' abilities to raise revenue and enhancing state contributions to ensure minimum funding levels. (Lockard, *In the Wake of* Williams v. State*: The Past, Present, and Future of Education Finance Litigation in California* (2005) 57 Hastings L.J. 385, 388-391; see generally *Wells v. One2One Learning Foundation*, *supra*, 39 Cal.4th at p. 1194 [discussing current funding regime].)

A second event of seismic significance followed shortly after, with the voters' 1978 adoption of Proposition 13. (Cal. Const., art. XIII A, added by Prop. 13, as approved by voters, Primary Elec. (June 6, 1978).) As noted, before 1978 cities and counties had been able to levy their own property taxes. Proposition 13 capped ad valorem real property taxes imposed by all local entities at 1 percent (Cal. Const., art. XIII A, § 1, subd. (a)), reducing the amount of revenue available by more than half (Stark, *The Right to Vote on Taxes* (2001)

5

96 Nw.U. L.Rev. 191, 198).  In place of multiple property taxes imposed by multiple political subdivisions, it substituted a single tax to be collected by counties and thereafter apportioned.  (Cal. Const., art. XIII A, § 1, subd. (a).)  Significantly, Proposition 13 did not specify how that 1 percent was to be divided, instead leaving the method of allocation to state law.  (See Cal. Const., art. XIII A, § 1, subd. (a) [real property tax is "to be . . . apportioned according to law to the districts within the counties"]; *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 225-227; *County of Los Angeles v. Sasaki*, *supra*, 23 Cal.App.4th at pp. 1454-1457; *City of Rancho Cucamonga v. Mackzum* (1991) 228 Cal.App.3d 929, 945.)

Proposition 13 transformed the government financing landscape in at least three ways relevant to this case.  First, by capping local property tax revenue, it greatly enhanced the responsibility the state would bear in funding government services, especially education.  (See *County of Los Angeles v. Sasaki*, *supra*, 23 Cal.App.4th at pp. 1451-1452; *California Teachers Assn. v. Hayes*, *supra*, 5 Cal.App.4th at pp. 1527-1528.)  Second, by failing to specify a method of allocation, Proposition 13 largely transferred control over local government finances from the state's many political subdivisions to the state, converting the property tax from a nominally local tax to a de facto state-administered tax subject to a complex system of intergovernmental grants.  (See Rev. & Tax. Code, § 95 et seq.; *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization*, *supra*, 22 Cal.3d at pp. 226-227; *Sasaki*, at pp. 1454-1455; Stark, *The Right to Vote on Taxes*, *supra*, 96 Nw.U. L.Rev. at p. 198.)[3]  Third, by imposing a unified,

---

[3]    State law dictates the formulas county auditor-controllers are to apply in allocating the property tax among cities, counties, special districts, and school districts.  Setting aside for the moment the portion of the property tax going to

*(footnote continued on next page)*

6

shared property tax, Proposition 13 created a zero-sum game in which political subdivisions (cities, counties, special districts, and school districts) would have to compete against each other for their slices of a greatly shrunken pie.

In 1988, the voters added another wrinkle with Proposition 98, which established constitutional minimum funding levels for education and required the state to set aside a designated portion of the General Fund for public schools. (Cal. Const., art. XVI, § 8; see *Los Angeles Unified School Dist. v. County of Los Angeles*, *supra*, 181 Cal.App.4th at p. 420; *California Teachers Assn. v. Hayes*, *supra*, 5 Cal.App.4th at pp. 1517-1518.)  Two years later, the voters revised and effectively increased the minimum funding requirements for public schools. (Prop. 111, Primary Elec. (June 5, 1990) amending Cal. Const., art. XVI, § 8; see *County of Sonoma v. Commission on State Mandates* (2000) 84 Cal.App.4th 1264, 1289.)

In response to these rising educational demands on the state treasury, the Legislature in 1992 created county educational revenue augmentation funds (ERAF's).  (Stats. 1992, chs. 699, 700, pp. 3081-3125; Rev. & Tax. Code, §§ 97.2, 97.3; see *Los Angeles Unified School Dist. v. County of Los Angeles*, *supra*, 181 Cal.App.4th at pp. 420-421; *City of El Monte v. Commission on State Mandates* (2000) 83 Cal.App.4th 266, 272-274; *County of Los Angeles v. Sasaki*, *supra*, 23 Cal.App.4th at p. 1447.)  It reduced the portion of property taxes allocated to local governments, deposited the difference in the ERAF's, deemed the balances part of the state's General Fund for purposes of satisfying Proposition 98

---

*(footnote continued from previous page)*

redevelopment agencies, roughly 57 percent of the remainder goes to schools, 21 percent to counties, 12 percent to cities, and 10 percent to special districts. (Legis. Analyst's Off., The 2011-2012 Budget: Should California End Redevelopment Agencies? (Feb. 9, 2011) p. 10.)

obligations, and distributed these amounts to school districts.  (*County of Sonoma v. Commission on State Mandates*, *supra*, 84 Cal.App.4th at pp. 1275-1276; see *Los Angeles Unified School Dist. v. County of Los Angeles*, *supra*, 181 Cal.App.4th at p. 426 [ERAF's are an " 'accounting device' " for reallocating property taxes to school districts from other local government entities].)  Periodically thereafter, the Legislature through supplemental legislation required local government entities to further contribute to the ERAF's in order to defray the state's Proposition 98 school funding obligations.  (*Los Angeles Unified School Dist.*, at pp. 420-421.)  Local governments had no vested right to property taxes (*id.* at p. 425); accordingly, the Legislature could require ERAF payments as "an exercise of [its] authority to apportion property tax revenues."  (*City of El Monte*, at p. 280; see Cal. Const., art. XIII A, § 1, subd. (a).)

**B.**  *Redevelopment Agencies*

In the aftermath of World War II, the Legislature authorized the formation of community redevelopment agencies in order to remediate urban decay.  (Stats. 1945, ch. 1326, p. 2478 et seq. [Community Redevelopment Act]; Stats. 1951, ch. 710, p. 1922 et seq. [codifying and renaming the Community Redevelopment Law, Health & Saf. Code, § 33000 et seq.];[4] see Cal. Const., art. XVI, § 16.)  The Community Redevelopment Law "was intended to help local governments revitalize blighted communities."  (*City of Cerritos v. Cerritos Taxpayers Assn.* (2010) 183 Cal.App.4th 1417, 1424; see *Marek v. Napa Community Redevelopment Agency* (1988) 46 Cal.3d 1070, 1082.)  It has since become a principal instrument of economic development, mostly for cities, with nearly 400 redevelopment agencies now active in California.

---

[4]    All further unlabeled statutory references are to the Health and Safety Code.

8

A redevelopment agency may be (and usually is) governed by the sponsoring community's own legislative body. (§ 33200; Coomes et al., Redevelopment in California (4th ed. 2009) pp. 21-23.)[5] An agency is authorized to "prepare and carry out plans for the improvement, rehabilitation, and redevelopment of blighted areas." (§ 33131, subd. (a).) To carry out such redevelopment plans, agencies may acquire real property, including by the power of eminent domain (§ 33391, subd. (b)), dispose of property by lease or sale without public bidding (§§ 33430, 33431), clear land and construct infrastructure necessary for building on project sites (§§ 33420, 33421), and undertake certain improvements to other public facilities in the project area (§ 33445). While redevelopment agencies have used their powers in a wide variety of ways, in one common type of project the redevelopment agency buys and assembles parcels of land, builds or enhances the site's infrastructure, and transfers the land to private parties on favorable terms for residential and/or commercial development. (Coomes, pp. 16-19; see, e.g., *Marek v. Napa Community Redevelopment Agency*, *supra*, 46 Cal.3d at p. 1075.)

Redevelopment agencies generally cannot levy taxes. (*Huntington Park Redevelopment Agency v. Martin* (1985) 38 Cal.3d 100, 106; *City of Cerritos v. Cerritos Taxpayers Assn.*, *supra*, 183 Cal.App.4th at p. 1424; *City of El Monte v. Commission on State Mandates*, *supra*, 83 Cal.App.4th at p. 269.) Instead, they rely on tax increment financing, a funding method authorized by article XVI, section 16 of the state Constitution and section 33670 of the Health and Safety Code. (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 866; *City of El*

---

**5** According to the Association's evidence, more than 98 percent of all redevelopment agencies are governed by a board consisting of the county board of supervisors or city council that created the agency.

9

*Monte*, at pp. 269-270.)  Under this method, those public entities entitled to receive property tax revenue in a redevelopment project area (the cities, counties, special districts, and school districts containing territory in the area) are allocated a portion based on the assessed value of the property prior to the effective date of the redevelopment plan.  Any tax revenue in excess of that amount—the tax increment created by the increased value of project area property—goes to the redevelopment agency for repayment of debt incurred to finance the project.  (Cal. Const., art. XVI, § 16, subds. (a), (b); § 33670, subds. (a), (b); *City of Dinuba*, at p. 866.)  In essence, property tax revenues for entities other than the redevelopment agency are frozen, while revenue from any increase in value is awarded to the redevelopment agency on the theory that the increase is the result of redevelopment.  (*City of Cerritos*, at p. 1424.)

The property tax increment revenue received by a redevelopment agency must be held in a special fund for repayment of indebtedness (§ 33670, subd. (b)), but the law does not restrict the amount of tax increment received in a given year to that needed for loan repayments in that year.  (*Marek v. Napa Community Redevelopment Agency*, *supra*, 46 Cal.3d at p. 1083.)  The only limit on the annual increment payment received is that it may not exceed the agency's *total* debt, less its revenue on hand.  (§ 33675, subd. (g).)  Once the entire debt incurred for a project has been repaid, all property tax revenue in the project area is allocated to local taxing agencies according to the ordinary formula.  (§ 33670, subd. (b).)

A powerful and flexible tool for community economic development, tax increment financing nonetheless "has sometimes been misused to subsidize a city's economic development through the diversion of property tax revenues from other taxing entities . . . ."  (*Lancaster Redevelopment Agency v. Dibley* (1993) 20 Cal.App.4th 1656, 1658; see *Regus v. City of Baldwin Park* (1977) 70 Cal.App.3d 968, 981-983.)  This practice became more common in the era of

10

constricted local tax revenue that followed the passage of Proposition 13.  Some small cities with blighted areas available for industrial redevelopment "were able to shield virtually all of their property tax revenue from other government agencies," but "[e]ven in ordinary cities . . . the temptation to use redevelopment as a financial weapon was considerable.  Because it limited increases in property tax rates, Proposition 13 created a kind of shell game among local government agencies for property tax funds.  The only way to obtain more funds was to take them from another agency.  Redevelopment proved to be one of the most powerful mechanisms for gaining an advantage in the shell game."  (Fulton & Shigley, Guide to California Planning (3d ed. 2005) pp. 263-264.)  Today, redevelopment agencies receive 12 percent of all property tax revenue in the state.  (See Assem. Bill 1X 26, § 1, subd. (f); Legis. Analyst's Off., The 2011-2012 Budget:  Should California End Redevelopment Agencies?, *supra*, p. 1.)

Addressing these concerns, the Legislature has required redevelopment agencies to make certain transfers of their tax increment revenue for other local needs.  First, 20 percent of the revenue generally must be deposited in a fund for provision of low and moderate income housing.  (§§ 33334.2, 33334.3, 33334.6; see *City of Cerritos v. Cerritos Taxpayers Assn.*, *supra*, 183 Cal.App.4th at p. 1424.)  Second, redevelopment agencies must make a graduated series of pass-through payments to local government taxing agencies such as cities, counties, and school districts from tax increment on projects adopted or expanded after 1994.  (§ 33607.5, subd. (a)(2); see *Los Angeles Unified School Dist. v. County of Los Angeles*, *supra*, 181 Cal.App.4th at pp. 421-422.)  The payments are distributed according to the taxing agencies' ordinary shares of property taxes.  (*Id*. at pp. 422-423.)

Of greatest relevance here, the Legislature has often required redevelopment agencies, like cities and counties, to make ERAF payments for the

11

benefit of school and community college districts.  (See §§ 33680, 33681.7 to 33681.15, 33685 to 33692; former § 33681 (Stats. 1992, ch. 700, § 1.5, pp. 3115-3116); former § 33681.5 (Stats. 1993, ch. 68, § 4, pp. 942-944); *Los Angeles Unified School Dist. v. County of Los Angeles*, *supra*, 181 Cal.App.4th at p. 421; *City of El Monte v. Commission on State Mandates*, *supra*, 83 Cal.App.4th at pp. 272-274.)  In each of the 2004-2005 and 2005-2006 fiscal years, redevelopment agencies were charged amounts intended to generate a combined $250 million.  (§ 33681.12, subd. (a)(2).)  In the 2008-2009 fiscal year, the Legislature required a combined $350 million or 5 percent of the total statewide tax increment allocated to redevelopment agencies under section 33670, whichever was greater, to be transferred to ERAF's (§ 33685, subd. (a)(2)), although that revenue shift was ultimately invalidated in litigation.  (*Cal. Redevelopment Assn. v. Genest* (Super. Ct. Sac. County, 2009, No. 34-2008-00028334-CU-WM-GDS.)  Similar provisions for shifts of tax increment revenue in the 2009-2010 and 2010-2011 fiscal years (§§ 33690, 33690.5) are the subjects of pending litigation.

Tax increment financing remains a source of contention because of the financial advantage it provides redevelopment agencies and their community sponsors, primarily cities, over school districts and other local taxing agencies. Additionally, because of the state's obligations to equalize public school funding across districts (Ed. Code, § 42238 et seq.) and to fund all public schools at minimum levels set by Proposition 98 (Cal. Const., art. XVI, § 8), the loss of property tax revenue by school and community college districts creates obligations for the state's General Fund.  (See *Los Angeles Unified School Dist. v. County of Los Angeles*, *supra*, 181 Cal.App.4th at pp. 419-422; Lefcoe, *Finding the Blight That's Right for California Redevelopment Law* (2001) 52 Hastings L.J. 991, 999 ["[W]here cities and counties shift property taxes from schools to redevelopment

projects, the state must make up the difference . . . .”].)  The effect of tax increment financing on school districts' property tax revenues has thus become a point of fiscal conflict between California's community redevelopment agencies and the state itself, a conflict manifesting in the current dispute.

### C.  *Propositions 1A and 22*

In addition to sporadically shifting property tax revenue from local governments to schools via ERAF's, the state in 1999 rolled back the vehicle license fee, a tax traditionally relied on by local governments and constitutionally allocated to cities and counties.  (Supplemental Voter Information Guide, Gen. Elec. (Nov. 2, 2004) Legis. Analyst's analysis of Prop. 1A, p. 5; see Cal. Const., art. XI, § 15.)  Though the state committed to backfill this lost revenue with payments from the General Fund, in 2004 it deferred the replacement payments. (Supplemental Voter Information Guide, Gen. Elec. (Nov. 2, 2004) Legis. Analyst's analysis of Prop. 1A, p. 5.)  Also in 2004, the state reduced local government's share of the sales tax by 0.25 percent, while making up for the lost revenue with additional property tax allocations, in order to permit the issuance of new state bonds.  (See Rev. & Tax. Code, §§ 97.68, 7203.1; Gov. Code, § 99050 et seq.)

Local government interests responded to these fluctuations in their revenue sources by qualifying for the ballot Proposition 65, a set of constitutional amendments to restrict such state actions in the future, but they subsequently agreed to support a compromise measure, Proposition 1A, instead.  (Supplemental Voter Information Guide, Gen. Elec. (Nov. 2, 2004) argument against Prop. 65, p. 15; see *id.*, Legis. Analyst's analysis of Prop. 1A, pp. 4-6.)  The voters approved Proposition 1A and rejected Proposition 65.  Among its reforms, Proposition 1A prevented the state from statutorily reducing or altering the existing allocations of property tax among cities, counties, and special districts.  (Cal. Const., art. XIII,

§ 25.5, subd. (a)(1), (3).)  Unlike Proposition 65, however, Proposition 1A did not extend its protections to redevelopment agencies.  (See Cal. Const., art. XIII, § 25.5, subd. (b)(2); Rev. & Tax. Code, § 95, subd. (a) [omitting redevelopment agencies from the definition of a local agency]; Supplemental Voter Information Guide, Gen. Elec. (Nov. 2, 2004) Legis. Analyst's analysis of Prop. 1A, p. 7 [contrasting the two measures and expressly noting that "*Proposition 1A's* restrictions do not apply to redevelopment agencies"]; *id.*, text of Prop. 65, p. 18 [including redevelopment agencies in its definition of protected special districts].)

In November 2010, following further legislative requirements that redevelopment agencies make ERAF payments, the voters approved Proposition 22.  Among the initiative's many statutory and constitutional revisions, one is most central to the Association's argument:  the addition of section 25.5, subdivision (a)(7) to article XIII of the state Constitution.  That provision limits what the Legislature may do with respect to redevelopment agency tax increment: "(a) On or after November 3, 2004, the Legislature shall not enact a statute to do any of the following:  [¶] . . . [¶] (7) Require a community redevelopment agency (A) to pay, remit, loan, or otherwise transfer, directly or indirectly, taxes on ad valorem real property and tangible personal property allocated to the agency pursuant to Section 16 of Article XVI to or for the benefit of the State, any agency of the State, or any jurisdiction; or (B) to use, restrict, or assign a particular purpose for such taxes for the benefit of the State, any agency of the State, or any jurisdiction," with two exceptions not pertinent here.  We address section 25.5, subdivision (a)(7) in more detail below.  (See *post*, pts. II.B.1., II.C.)

D. *Assembly Bills 1X 26 and IX 27*

In December 2010, then Governor Schwarzenegger declared a state fiscal emergency.  (See Cal. Const., art. IV, § 10, subd. (f)(1).)  On January 20, 2011, incoming Governor Brown renewed the declaration and convened a special

14

session of the Legislature to address the state's budget crisis. (Legis. Counsel's Digest, Assem. Bill 1X 26; see also *Professional Engineers in California Government v. Schwarzenegger* (2010) 50 Cal.4th 989, 1001-1002 [detailing the ongoing crisis].)

As a partial means of closing the state's projected $25 billion operating deficit, Governor Brown originally proposed eliminating redevelopment agencies entirely. (See Legis. Analyst's Off., Governor's Redevelopment Proposal (Jan. 18, 2011) p. 4.) Parallel bills were introduced in the Senate and Assembly to "eliminate[] redevelopment agencies (RDAs) and specif[y] a process for the orderly wind-down of RDA activities . . . ." (Sen. Rules Com., Off. of Sen. Floor Analyses, analysis of Sen. Bill No. 77 (2011-2012 Reg. Sess.) as amended Mar. 15, 2011, p. 1; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 101 (2011-2012 Reg. Sess.) as amended Mar. 15, 2011, p. 1.) Ultimately, however, the Legislature took a slightly different approach; in June 2011 it passed, and the Governor signed, the two measures we consider here.

Assembly Bills 1X 26 and IX 27 consist of three principal components, codified as new parts 1.8, 1.85 (both Assem. Bill 1X 26) and 1.9 (Assem. Bill 1X 27) of division 24 of the Health and Safety Code. Part 1.8 (§§ 34161 to 34169.5) is the "freeze" component: it subjects redevelopment agencies to restrictions on new bonds or other indebtedness; new plans or changes to existing plans; and new partnerships, including joint powers authorities (§§ 34162 to 34165). Cities and counties are barred from creating any new redevelopment agencies. (§ 34166.) Existing obligations are unaffected; redevelopment agencies may continue to make payments and perform existing obligations until other agencies take over. (§ 34169.) Part 1.8's purpose is to preserve redevelopment agency assets and revenues for use by "local governments to fund core

15

governmental services" such as fire protection, police, and schools. (§ 34167, subd. (a).)

Part 1.85 (§§ 34170 to 34191) is the dissolution component. It dissolves all redevelopment agencies (§ 34172) and transfers control of redevelopment agency assets to successor agencies, which are contemplated to be the city or county that created the redevelopment agency (§§ 34171, subd. (j), 34173, 34175, subd. (b)). Part 1.85 requires successor agencies to continue to make payments and perform existing obligations. (§ 34177.) However, unencumbered balances of redevelopment agency funds must be remitted to the county auditor-controller for distribution to cities, the county, special districts, and school districts in proportion to what each agency would have received absent the redevelopment agencies. (See §§ 34177, subd. (d), 34183, subd. (a)(4), 34188.) Proceeds from redevelopment agency asset sales likewise must go to the county auditor-controller for similar distribution. (§ 34177, subd. (e).) Finally, tax increment revenues that would have gone to redevelopment agencies must be deposited in a local trust fund each county is required to create and administer. (§§ 34170.5, subd. (b), 34182, subd. (c)(1).) All amounts necessary to satisfy administrative costs, pass-through payments, and enforceable obligations will be allocated for those purposes, while any excess will be deemed property tax revenue and distributed in the same fashion as balances and assets. (§§ 34172, subd. (d), 34183, subd. (a).)

Part 1.9 (§§ 34192 to 34196), however, offers an exemption from dissolution for cities and counties that agree to make specified payments to both the county ERAF and a new county special district augmentation fund on behalf of their redevelopment agencies. Each city or county choosing this option must notify the state it will do so and pass an ordinance to that effect. (§§ 34193, subd. (b), 34193.1.) If it does, its redevelopment agency will be permitted to continue in operation without interruption, as is, under the Community Redevelopment Law.

16

(§ 34193, subd. (a).)  The amounts owed are to be calculated annually by the state's Director of Finance based on the fractional share of net and gross statewide tax increment each redevelopment agency has received in prior years, multiplied by $1.7 billion for this fiscal year and $400 million for all subsequent fiscal years. (§ 34194, subds. (b)(2), (c)(1)(A).)[6]

Payments are due on January 15 and May 15 each year.  (§ 34194, subd. (d)(1).)  While remittances are nominally owed by cities and counties, the measure authorizes each community sponsor to contract with its redevelopment agency to receive tax increment in the amount owed, so that payments may effectively come from tax increment.  (§ 34194.2.)  Finally, any lapse in payments will result in a redevelopment agency's dissolution.  (§ 34195.)

On August 17, 2011, we stayed parts 1.85 and 1.9, with minor exceptions, to prevent redevelopment agencies from being dissolved during the pendency of this matter.  (Health & Saf. Code, div. 24, pts. 1.85, 1.9.)

## II. DISCUSSION

### A. *Jurisdiction*

Santa Clara pleads as an affirmative defense that we lack jurisdiction. Though it does not further argue the point, we have an independent obligation in this as in every matter to confirm whether jurisdiction exists.  (See *Walker v. Superior Court* (1991) 53 Cal.3d 257, 267; *Abelleira v. District Court of Appeal*

---

**6** It follows that, if all redevelopment agency sponsors opted in and paid their pro rata shares, Assembly Bill 1X 27 would generate $1.7 billion in 2011-2012 and $400 million in each subsequent fiscal year.  Of these sums, $4.3 million is scheduled to go to transit and fire districts in 2011-2012 and $60 million in each subsequent year, with the balance going to schools and community colleges via the ERAF.  (§ 34194.4, subd. (a).)  ERAF payments in 2011-2012 count against the state's Proposition 98 obligations; in future years, they do not.  (§ 34194.1, subds. (b), (c).)

(1941) 17 Cal.2d 280, 302-303; *Linnick v. Sedelmeier* (1968) 262 Cal.App.2d 12, 12; see also *Marbury v. Madison* (1803) 5 U.S. 137, 173-175.) Assembly Bill 1X 26 provides that "[n]otwithstanding any other law, any action contesting the validity of this part [1.8] or Part 1.85 . . . or challenging acts taken pursuant to these parts shall be brought in the Superior Court of the County of Sacramento." (§ 34168, subd. (a).) We conclude this provision does not deprive us of jurisdiction.

In filing a petition for writ of mandate with this court in the first instance, the Association has asked us to invoke our original jurisdiction. That jurisdiction is constitutional. (Cal. Const., art. VI, § 10 [vesting the Supreme Ct. with original jurisdiction "in proceedings for extraordinary relief in the nature of mandamus, certiorari, and prohibition"].) It may not be diminished by statute. (*Chinn v. Superior Court* (1909) 156 Cal. 478, 480 ["[W]here the judicial power of courts, either original or appellate, is fixed by constitutional provisions, the legislature cannot either limit or extend that jurisdiction."]; see also *Modern Barber Col. v. Cal. Emp. Stab. Com.* (1948) 31 Cal.2d 720, 731; *Standard Oil Co. v. State Board of Equal.* (1936) 6 Cal.2d 557, 562; *Lemen v. Edmunson* (1927) 202 Cal. 760, 762.)

The Legislature does retain the power to regulate matters of judicial procedure. (*Powers v. City of Richmond* (1995) 10 Cal.4th 85, 98-110; *Modern Barber Col. v. Cal. Emp. Stab. Com.*, *supra*, 31 Cal.2d at p. 731.) In some instances, the exercise of that power may appear to "defeat or interfere with the exercise of jurisdiction or of the judicial power" and thus come into tension with the general prohibition against impairing a constitutional grant of jurisdiction. (*Garrison v. Rourke* (1948) 32 Cal.2d 430, 436.) We avoid such constitutional conflicts whenever possible by construing legislative enactments strictly against the impairment of constitutional jurisdiction: " '[A]n intent to defeat the exercise

18

of the court's jurisdiction will not be supplied by implication.' " (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 87, quoting *Garrison*, at p. 436; see also *Garrison*, at p. 435 ["The jurisdiction thus vested [by Cal. Const., art. VI] may not lightly be deemed to have been destroyed."].)

To avoid intrusion on our constitutional jurisdiction, section 34168, subdivision (a) is best read narrowly as applying only to, and designating a forum for, "action[s]" (*ibid.*), over which we retain appellate jurisdiction, while having no bearing on jurisdiction over "special proceedings" such as petitions for writs of mandate (see *Public Defenders' Organization v. County of Riverside* (2003) 106 Cal.App.4th 1403, 1409; compare Code Civ. Proc., pt. 2, § 307 et seq. [regulating civil actions] with Code Civ. Proc., pt. 3, § 1063 et seq. [regulating special proceedings of a civil nature]).  It follows that, notwithstanding the fact the Association's petition challenges the validity of parts 1.8 and 1.85 of division 24 of the Health and Safety Code, we have jurisdiction to address it.

We will invoke our original jurisdiction where the matters to be decided are of sufficiently great importance and require immediate resolution.  (E.g., *Strauss v. Horton* (2009) 46 Cal.4th 364, 398-399; *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 340; *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization*, *supra*, 22 Cal.3d at p. 219.)  Those circumstances are present here:  Assembly Bills 1X 26 and 1X 27 place the state's nearly 400 redevelopment agencies under threat of imminent dissolution, while the Association's petition calls into question the proper allocation of billions of dollars in property tax revenue.

### B. *The Constitutionality of Assembly Bill 1X 26*

We turn now to the merits.  In assessing the validity of Assembly Bills 1X 26 and 1X 27, we are mindful that "all intendments favor the exercise of the Legislature's plenary authority:  'If there is any doubt as to the Legislature's

19

power to act in any given case, the doubt should be resolved in favor of the Legislature's action. Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used.' [Citations.]" (*Methodist Hosp. of Sacramento v. Saylor* (1971) 5 Cal.3d 685, 691.)

### 1. *The Dissolution of Redevelopment Agencies Under Part 1.85 of Division 24 of the Health and Safety Code*

In enacting Assembly Bill 1X 26, the Legislature asserted that "[r]edevelopment agencies were created by statute and can therefore be dissolved by statute." (Assem. Bill 1X 26, § 1, subd. (h).) We conclude the Legislature was correct.

At the core of the legislative power is the authority to make laws. (*Nougues v. Douglass* (1857) 7 Cal. 65, 70 ["The legislative power is the creative element in the government . . . . [It] makes the laws . . . ."].) The state Constitution vests that power, except as exercised by or reserved to the people themselves, in the Legislature. (Cal. Const., art. IV, § 1; *McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 472; *Nougues,* at p. 69 ["[I]n all cases where not exercised and not reserved, all the legislative power of the people of the State is vested in the Legislature . . ." (italics omitted)].)

Of significance, the legislative power the state Constitution vests is plenary. Under it, "the entire law-making authority of the state, except the people's right of initiative and referendum, is vested in the Legislature, and that body may exercise any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution." (*Methodist Hosp. of Sacramento v. Saylor*, *supra*, 5 Cal.3d at p. 691; see also *Marine Forests Society v. California Coastal*

*Com.* (2005) 36 Cal.4th 1, 31; *People v. Tilton* (1869) 37 Cal. 614, 626 [under the state Const., "[f]ull power exists when there is no limitation."].)**[7]**

We thus start from the premise that the Legislature possesses the full extent of the legislative power and its enactments are authorized exercises of that power. Only where the state Constitution withdraws legislative power will we conclude an enactment is invalid for want of authority. "In other words, 'we do not look to the Constitution to determine whether the legislature is authorized to do an act, but only to see if it is prohibited.' " (*Methodist Hosp. of Sacramento v. Saylor*, *supra*, 5 Cal.3d at p. 691, quoting *Fitts v. Superior Court* (1936) 6 Cal.2d 230, 234; accord, *State Personnel Bd. v. Department of Personnel Admin.* (2005) 37 Cal.4th 512, 523; *County of Riverside v. Superior Court* (2003) 30 Cal.4th 278, 284.)

A corollary of the legislative power to make new laws is the power to abrogate existing ones. What the Legislature has enacted, it may repeal. (See *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 518 [if a "power is statutory, the Legislature may eliminate it"]; *Estate of Potter* (1922) 188 Cal. 55, 63 [rights that "are creatures of legislative will" may be withdrawn by the Legislature]; *County of Sacramento v. Lackner* (1979) 97 Cal.App.3d 576, 589 [" ' "Every legislative body may modify or abolish the acts passed by itself or its predecessors." ' "].)

In particular, if a political entity has been created by the Legislature, it can be dissolved by the Legislature, barring some specific constitutional obstacle to a particular exercise of the legislative power. "In our federal system the states are

---

**[7]**    In this regard, the state and federal Constitutions operate in very different ways. Whereas under the federal Constitution, Congress has only those powers that are expressly granted to it, under the state Constitution, the Legislature has all legislative powers except those that are expressly withdrawn from it. (*Methodist Hosp. of Sacramento v. Saylor*, *supra*, 5 Cal.3d at p. 691.)

21

sovereign but cities and counties are not; in California as elsewhere they are mere creatures of the state and exist only at the state's sufferance." (*Board of Supervisors v. Local Agency Formation Com.* (1992) 3 Cal.4th 903, 914; see also *City of El Monte v. Commission on State Mandates*, *supra*, 83 Cal.App.4th at p. 279 ["Only the state is sovereign and, in a broad sense, all local governments, districts, and the like are subdivisions of the state."].)  It follows from the fundamental nature of this relationship between a state and its political subdivisions that " 'states have "extraordinarily wide latitude . . . in creating various types of political subdivisions and conferring authority upon them." [Citation.]' " (*Board of Supervisors*, at pp. 915-916.)  As the United States Supreme Court has recognized in the context of municipal corporations:  "The number, nature and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the State. . . .  The State, therefore, at its pleasure may modify or withdraw all such powers, . . . expand or contract the territorial area, unite the whole or a part of it with another municipality, [or] repeal the charter and destroy the corporation." (*Hunter v. Pittsburgh* (1907) 207 U.S. 161, 178-179, quoted with approval in *Board of Supervisors*, at p. 915.)  The state (and, in particular, the Legislature) has "plenary power to set the conditions under which its political subdivisions are created" (*Board of Supervisors*, at p. 917); equally so, it has plenary power to set the conditions under which its political subdivisions are abolished (*Curtis v. Board of Supervisors* (1972) 7 Cal.3d 942, 951; *Petition East Fruitvale Sanitary Dist.* (1910) 158 Cal. 453, 457).[8]

---

**8**    The Legislature has in the past lawfully exercised this authority by dissolving municipal corporations formerly established under state law.  (See, e.g., Stats. 1972, ch. 650, § 2, p. 1209 [disincorporating the Town of Hornitos].)  As

*(footnote continued on next page)*

22

Redevelopment agencies are political subdivisions of the state and creatures of the Legislature's exercise of its statutory power, the progeny of the Community Redevelopment Law.  (See § 33000 et seq.; 11 Miller & Starr, Cal. Real Estate (3d ed. 2001) § 30B:2, p. 6 ["The redevelopment agency is solely a creature of state statute, exercising powers delegated to it by the state legislature in matters of state concern, and the scope of its authority is, therefore, defined and limited by the Community Redevelopment Law . . . ."].)  Consistent with that nature, the Legislature has in the past routinely narrowed and expanded redevelopment agencies' various rights.  (E.g., Stats. 1976, ch. 1337, p. 6061 et seq. [imposing low income housing requirements]; Stats. 1993, ch. 942, p. 5334 et seq. [Community Redevelopment Law Reform Act of 1993, enacting wide-ranging reforms]; Stats. 2001, ch. 741 [amending redevelopment sunset provisions].)  Most significantly, the Legislature has mandated that redevelopment plans receiving tax increment have finite durations.  (§ 33333.2; *Community Redevelopment Agency v. County of Los Angeles* (2001) 89 Cal.App.4th 719, 722.)

The Association offers a twofold argument for why, notwithstanding the legislative authority over redevelopment agencies historically inherent in the state Constitution, the dissolution provisions of Assembly Bill 1X 26 are invalid.  First, the Association posits that Assembly Bill 1X 26 is inconsistent with article XVI, section 16 of the state Constitution, governing tax increment revenue.  Second, the

---

*(footnote continued from previous page)*

well, we have recognized the power to dissolve with respect to school districts: "[T]he local-district system of school administration, though recognized by the Constitution and deeply rooted in tradition, is not a constitutional mandate, but a legislative choice.  [Citation.]  The Constitution has always vested 'plenary' power over education not in the districts, but in the State, through its Legislature, which may create, dissolve, combine, modify, and regulate local districts at pleasure." (*Butt v. State of California*, *supra*, 4 Cal.4th at p. 688.)

Association argues that Proposition 22 (as approved by voters, Gen. Elec. (Nov. 2, 2010)) amended the state Constitution to effectively withdraw from the Legislature the power to dissolve community redevelopment agencies for the financial benefit of the state.

What is now article XVI, section 16 was added by initiative in 1952,[9] shortly after the Legislature enacted the Community Redevelopment Law.[10] It made express the Legislature's authority to authorize property tax increment financing of redevelopment agencies and projects. However, nothing in its text creates an absolute right to an allocation of property taxes. (See Cal. Const., art. XVI, § 16 ["The Legislature *may* provide that any redevelopment plan *may* contain a provision" diverting tax increment to redevelopment agencies (italics added)].)[11] Nor does anything in the text of the section mandate that redevelopment agencies, once created, must exist in perpetuity. On its face, the provision is not self-executing and conveys no rights; rather, it authorizes the

[9]     It was originally adopted as article XIII, section 19 and, as part of a constitutional restructuring, was subsequently moved without material change to its present location.

[10]     A principal purpose of the proposed constitutional amendment was to remove any doubt about the legality of the Community Redevelopment Law: "All of the provisions of the Community Redevelopment Law, as amended in 1951, which relate to the use or pledge of taxes or portions thereof as herein provided, or which, if effective, would carry out the provisions of this section or any part thereof, are hereby approved, legalized, ratified and validated and made fully and completely effective and operative upon the effective date of this amendment." (Cal. Const., art. XIII, former § 19, added by initiative, Gen. Elec. (Nov. 4, 1952).)

[11]     In the same vein, article XVI, section 16 specifies that it does "not affect any other law or laws relating to the same or a similar subject but is intended to *authorize an alternative method of procedure* governing the subject to which it refers." (Italics added.) In other words, it permits, but does not require, tax increment financing as one new option for funding redevelopment.

Legislature to enact statutes, and local governments to adopt redevelopment plans, that are consistent with its scope.

What is apparent from the constitutional provision's text is confirmed by its history. The ballot materials provided to the voters gave no hint that the proposed amendment was intended to make redevelopment agencies or tax increment financing a permanent part of the government landscape. Rather, consistent with the text's use of the permissive "may," the Legislative Counsel explained that the proposed amendment was intended simply to "authorize"—but not require—the Legislature to provide for tax increment financing for redevelopment. (Proposed Amendments to Constitution: Propositions and Proposed Laws, Gen. Elec. (Nov. 4, 1952) Legis. Counsel's analysis of Assem. Const. Amend. No. 55, p. 19.) The arguments in favor of the proposed amendment similarly emphasized its nonmandatory character: "This constitutional amendment . . . is in effect an enabling act to give the Legislature authority to enact legislation which will provide for the handling of the proceeds of taxes levied upon property in a redevelopment project. It is permissive in character and can become effective in practice only by acts of the Legislature and the local governing body, the City Council or Board of Supervisors. It will make possible the passage of laws providing that tax revenues derived from any increase in the assessed value of property within a redevelopment area because of new improvements, shall be placed in a fund to defray all or part of the cost of the redevelopment project that would otherwise have to be advanced from public funds." (*Id.*, argument in favor of Assem. Const. Amend. No. 55, p. 20.)

Against these indicia of intent, the Association emphasizes the final sentence of article XVI, section 16: "The Legislature *shall* enact those laws as may be necessary to enforce the provisions of this section." (Italics added.) The word "shall," however, depending on the context in which it is used, is not

25

necessarily mandatory.  (*People v. Lara* (2010) 48 Cal.4th 216, 227; *Nunn v. State of California* (1984) 35 Cal.3d 616, 625; see Garner's Dict. of Legal Usage (3d ed. 2011) pp. 952-953.)  Moreover, consistent with its character as an "enabling act" (Proposed Amendments to Constitution:  Propositions and Proposed Laws, Gen. Elec. (Nov. 4, 1952) argument in favor of Assem. Const. Amend. No. 55, p. 20), the final sentence directs only passage of those laws "as may be necessary."  This portion of the text confirms the Legislature's authority to pass legislation it deems necessary to carry out the ends of redevelopment, but imposes no obligation to enact any particular law.  It does not mandate that redevelopment agencies, or the allocation of tax increment to them, be made permanent.

The Association also looks to our decision in *Marek v. Napa Community Redevelopment Agency*, *supra*, 46 Cal.3d 1070.  There, we determined that "indebtedness," the term used to measure how much property tax increment should be allocated to a redevelopment agency (see Cal. Const., art. XVI, § 16, subd. (b); §§ 33670, 33675), should be interpreted broadly (*Marek*, at pp. 1081-1086).  We cautioned that neither article XVI, section 16 nor the Community Redevelopment Law, as then written, contemplated that "other tax entities [would] share in tax increment revenues at any time before the agency's total indebtedness has been paid or the amount in its 'special fund' is sufficient to pay its total indebtedness."  (*Marek*, at p. 1087.)  The Association contends Assembly Bill 1X 26 is invalid because it fails to continue allocating tax increment for existing indebtedness as broadly as in the past, most notably by allocating tax increment for only some, but not all, obligations owed by redevelopment agencies to their community sponsors.  (See §§ 34171, subd. (d)(2), 34178, subd. (b).)[12]

---

[12]    As Matosantos noted at oral argument, the Legislature could well recognize that because of the conjoined nature of the governing boards of redevelopment

*(footnote continued on next page)*

26

This argument misperceives both the role of article XVI, section 16 of the state Constitution and the nature of the issue we resolved in *Marek v. Napa Community Redevelopment Agency*, *supra*, 46 Cal.3d 1070. Article XVI, section 16 does not protect the receipt of tax increment funds up to the amount of a redevelopment agency's total indebtedness, nor does it grant a constitutional right to continue to receive tax increment for as long as redevelopment agencies have debt; rather, it authorizes the Legislature to statutorily grant redevelopment agencies rights to tax increment up to the amount of their total indebtedness. As the Legislature may extend that authorization (and did, in the Community Redevelopment Law), so it may limit or withdraw that authorization (as it has, in Assem. Bill 1X 26) without violating article XVI, section 16. In *Marek*, we addressed only the scope of the statutory term "indebtedness" and the corresponding scope of the constitutional authorization for redevelopment agencies to be granted statutory rights to tax increment; that issue has no bearing on the question we face here—whether article XVI, section 16 limits the Legislature's power to dissolve existing redevelopment agencies in the midst of ongoing projects. *Marek* thus is inapposite.

Finally, the Association draws our attention to the first two sentences of an uncodified section (§ 9) of Proposition 22, which, it contends, confirms that article XVI, section 16 is a guarantee of tax increment funding and a protection against dissolution. That section begins: "Section 16 of Article XVI of the Constitution requires that a specified portion of the taxes levied upon the taxable property in a redevelopment project each year be allocated to the redevelopment agency to

---

*(footnote continued from previous page)*

agencies and their community sponsors, such obligations often were not the product of arm's-length transactions.

27

repay indebtedness incurred for the purpose of eliminating blight within the redevelopment project area. Section 16 of Article XVI prohibits the Legislature from reallocating some or that entire specified portion of the taxes to the State, an agency of the State, or any other taxing jurisdiction, instead of to the redevelopment agency." (Prop. 22, Gen. Elec. (Nov. 2, 2010) § 9.) Whether or not article XVI, section 16 originally required tax increment allocations to be made to redevelopment agencies, rather than simply authorizing the Legislature to pass legislation approving such allocations, the Association contends that after this voter-approved statement, article XVI, section 16 must now be read to so provide.

We reject this contention. The assertion in Proposition 22, section 9 that tax increment allocations to redevelopment agencies are constitutionally mandated, rather than constitutionally authorized and statutorily mandated, is a clear misstatement of the law as it stood prior to the passage of Proposition 22. Moreover, section 9 of Proposition 22 does not purport to amend article XVI, section 16 or to change existing law concerning the *source* of redevelopment agencies' entitlement, if any, to tax increment.[13] Accordingly, we decline to treat its immaterial misstatement of law as a basis for silently amending the state Constitution.

---

[13]    The purpose of section 9, instead, is simply to explain that the Legislature had been requiring the transfer of redevelopment agency tax increment, and that Proposition 22 was intended to eliminate future transfers: "The Legislature has been illegally circumventing Section 16 of Article XVI in recent years by requiring redevelopment agencies to transfer a portion of those taxes for purposes other than the financing of redevelopment projects. A purpose of the amendments made by this measure is to prohibit the Legislature from requiring, after the taxes have been allocated to a redevelopment agency, the redevelopment agency to transfer some or all of those taxes to the State, an agency of the State, or a jurisdiction; or to use some or all of those taxes for the benefit of the State, an agency of the State, or a jurisdiction." (Prop. 22, Gen. Elec. (Nov. 2, 2010) § 9.)

The various ways in which the Association contends Assembly Bill 1X 26 is inconsistent with article XVI, section 16 of the state Constitution all flow from the assumption that section 16 establishes for redevelopment agencies an absolute right to continued existence. Because we can find no such right in the constitutional provision, article XVI, section 16 does not invalidate Assembly Bill 1X 26.

The Association's alternate constitutional argument rests on article XIII, section 25.5, subdivision (a)(7) of the state Constitution, added in 2010 by Proposition 22. Examining both the text and the various ballot arguments in support of and against that initiative, we find nothing in them that would limit the Legislature's plenary authority over the existence *vel non* of redevelopment agencies.

Article XIII, section 25.5, subdivision (a)(7)(A) of the state Constitution generally prohibits the Legislature from requiring a redevelopment agency to pay property taxes "allocated to the agency pursuant to Section 16 of Article XVI to or for the benefit of the State" or its agencies and jurisdictions,[14] or otherwise restricting or assigning such taxes for the state's benefit. The provision, the Association reasons, both presumes and protects the existence of redevelopment agencies. Dissolving redevelopment agencies would entail an impermissible diversion of their tax increment to third parties, in contravention of section 25.5, subdivision (a)(7)(A). Moreover, if the state cannot assign tax increment to third parties, that increment must go to redevelopment agencies; hence, redevelopment agencies must be entitled to exist to receive it.

---

[14] "Jurisdiction" as used here includes both special districts and school districts. (See Cal. Const., art. XIII, § 25.5, subd. (b)(3); Rev. & Tax. Code, § 95, subds. (a), (b).)

This argument suffers from a surface implausibility. The constitutionalization of a political subdivision—the alteration of a local government entity from a statutory creation existing only at the pleasure of the sovereign state to a constitutional creation with life and powers of independent origin and standing—would represent a profound change in the structure of state government. Municipal corporations, though of far more ancient standing than redevelopment agencies, have never achieved such status. (See Cal. Const., art. XI, § 2, subd. (a) [specifying the Legislature's authority over city formation and powers].) Proposition 22 contains no express language constitutionalizing redevelopment agencies. (Cf. Cal. Const., art. XXXV, § 1, added by initiative, Gen. Elec. (Nov. 2, 2004) [creating the Cal. Institute for Regenerative Medicine as a constitutional entity]; *id.*, art. XXI, § 2, added by initiative, Gen. Elec. (Nov. 4, 2008) [creating the Citizens Redistricting Com. as a constitutional entity].) It would be unusual in the extreme for the people, exercising legislative power by way of initiative, to adopt such a fundamental change only by way of implication, in an initiative facially dealing with purely fiscal matters, in a corner of the state Constitution addressing taxation. As the United States Supreme Court has put it, the drafters of legislation "do[] not, one might say, hide elephants in mouseholes." (*Whitman v. American Trucking Assns., Inc.* (2001) 531 U.S. 457, 468.)

The principle of *inclusio unius est exclusio alterius* applies here. Proposition 22 expressly adds numerous limits to the Legislature's statutory powers (Prop. 22, Gen. Elec. (Nov. 2, 2010) §§ 3-5, 5.3, 6-6.1, 7), and in one instance withdraws from the Legislature a preexisting constitutional power (*id.*, § 5.6 [repealing Cal. Const., art. XIX, former § 6]), but makes no mention of any intent to divest the Legislature of the power to dissolve redevelopment agencies. If the initiative proponents and voters had intended to strip the Legislature of that

30

power or to alter the Legislature's article XVI, section 16 permissive authority, it stands to reason they would have said so expressly.

Had the voters in fact intended to amend the Constitution to fundamentally alter the relationship between the state and this class of political subdivision, we would, moreover, expect to find at least a single mention of such an intention in the various supporting and opposing ballot arguments. Instead, we find silence. The Legislative Analyst's review of the initiative identifies no such anticipated effect. (Voter Information Guide, Gen. Elec. (Nov. 2, 2010) pp. 30-35.) Indeed, the ballot argument in favor of Proposition 22 and the rebuttal to the argument against it do not even mention redevelopment. (Voter Information Guide, at pp. 36-37.) Only the opposing arguments highlight redevelopment and then only to criticize the initiative for how it secretly channels tax dollars to redevelopment agencies. (*Ibid.*)

The Association suggests it is not asserting an absolute right to perpetual existence, only a right for some form of agency to exist to receive redevelopment funds for as long as there is an active redevelopment plan and indebtedness. This framing does not change the analysis or conclusions. It would mean the Legislature's power to dissolve vanished as soon as a redevelopment agency was created; thereafter, an agency or its similarly tasked successor effectively could expire only of natural causes, after every project it might undertake in its jurisdiction had been completed and paid off. No hint of such a right is disclosed in the text or history of either article XVI, section 16 or article XIII, section 25.5, subdivision (a)(7) of the state Constitution.

Contrary to the Association's contention, declining to imply into article XIII, section 25.5, subdivision (a)(7) a constitutional guarantee of continued existence for redevelopment agencies does not render the subdivision a nullity. Though the Legislature retains the broad power to dissolve redevelopment

31

agencies, Proposition 22 strips it of the narrower power to insist on transfers to third parties of property tax revenue already allocated to redevelopment agencies, as it had done on numerous previous occasions. (See §§ 33680, 33681.7 to 33681.15, 33685 to 33692; former § 33681 (Stats. 1992, ch. 700, § 1.5, pp. 3115-3116); former § 33681.5 (Stats. 1993, ch. 68, § 4, pp. 942-944).) It is precisely such "raids" the text of Proposition 22 and the arguments in support of it denounce. (Voter Information Guide, Gen. Elec. (Nov. 2, 2010) p. 36; see Prop. 22, Gen. Elec. (Nov. 2, 2010) §§ 2, subds. (e), (g), 2.5, 9.) The protection so granted is not insignificant simply because it is conditioned on redevelopment agencies' existing and having property tax increment allocated to them.

Accordingly, we discern no constitutional impediment to the Legislature's electing to dissolve the state's redevelopment agencies under part 1.85 of division 24 of the Health and Safety Code.

2. *Freezing Redevelopment Agency Transactions Under Part 1.8 of Division 24 of the Health and Safety Code*

As a means of facilitating dissolution under division 24, part 1.85, the Legislature in division 24, part 1.8 has suspended redevelopment agencies' ability to make free use of their funds. (See, e.g., §§ 34161 [prohibiting new or expanded debts except as provided in pt. 1.8], 34162 [limiting new indebtedness], 34167, subd. (a) ["provisions of this part shall be construed as broadly as possible to . . . restrict the expenditure of funds to the fullest extent possible"].) The purpose of these restrictions is "to preserve, to the maximum extent possible, the revenues and assets of redevelopment agencies so that those assets and revenues that are not needed to pay for enforceable obligations may be used by local governments to fund core governmental services including police and fire protection services and schools." (§ 34167, subd. (a); see also Assem. Bill 1X 26, § 1, subd. (j)(1) [the intent of pt. 1.8 is to bar new obligations pending dissolution].) The Association

32

contends these limits violate article XIII, section 25.5, subdivision (a)(7)(B) of the state Constitution, prohibiting restrictions on the use of property taxes allocated to redevelopment agencies for the benefit of the state or its agencies.[15] We conclude this portion of Assembly Bill 1X 26 is valid as well.

The power to abolish an entity necessarily encompasses the incidental power to declare its ending point.[16] If Proposition 22, as we have concluded, was not intended to strip the Legislature of the power to terminate redevelopment agencies, then it could not have been intended to deprive the Legislature of the ability to decide when redevelopment agencies could cease to exist as legal entities or at what point, as part of winding up and dissolving, they would be relieved of the ability to make new binding commitments and engage in new business. As a practical and perhaps constitutional matter, to require an existing entity that has entered into a web of current contractual and other obligations to dissolve instantaneously is not possible; doing so would inevitably raise serious impairment of contract questions. (See U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.)

As Matosantos argues, and we agree, Proposition 22's limit on state restrictions of redevelopment agencies' use of their funds is best read as limiting the Legislature's powers during the operation, rather than the dissolution, of redevelopment agencies. Article XIII, section 25.5, subdivision (a)(7)(B) prohibits, with minor exceptions, further legislative restrictions on the use of

---

[15] California Constitution, article XIII, section 25.5, subdivision (a)(7) prohibits the Legislature from "[r]equir[ing] a community redevelopment agency . . . (B) to use, restrict, or assign a particular purpose for such taxes for the benefit of the State, any agency of the State, or any jurisdiction," with exceptions not applicable here.

[16] The Legislature has already wielded an analogous power by imposing time limits on the life spans of agencies' redevelopment plans. (§ 33333.2.)

property taxes allocated to redevelopment agencies under article XVI, section 16. Article XVI, section 16, in turn, creates no absolute right to an allocation of property taxes. (See Cal. Const., art. XVI, § 16 ["The Legislature *may* provide that any redevelopment plan *may* contain a provision" diverting tax increment to redevelopment agencies (italics added)].) Thus, *if* the Legislature exercises its constitutional power to authorize allocation of property taxes to redevelopment agencies, and *if* a redevelopment plan so provides, *then* those taxes so allocated to an operating redevelopment agency may not be restricted to benefit the state by further legislative action.

The Legislature in fact exercised that constitutional power when adopting and subsequently amending the Community Redevelopment Law (see §§ 33670, 33675), but the right of redevelopment agencies to tax increment funding thereby created was statutory, not constitutional. In turn, Assembly Bill 1X 26 revises those statutory rights. The Legislature has determined that tax increment should no longer be allocated to redevelopment agencies (Assem. Bill 1X 26, § 1, subd. (i) [upon agencies' dissolution, property taxes are no longer to be deemed tax increment and allocated to redevelopment agencies]), except insofar as necessary to satisfy existing obligations. The measure exercises the Legislature's constitutional power to authorize property tax increment revenue for, or to withdraw that authorization from, redevelopment agencies. (See Cal. Const., art. XVI, § 16.) As such, the measure modifies the constitutional predicate for the operation of article XIII, section 25.5, subdivision (a)(7)(B) of the state Constitution. In the absence of property tax increment allocated under article XVI, the latter subdivision has no force or effect.

Redevelopment agencies, moreover, have a conditional right to the allocation of tax increment only to the extent of any existing indebtedness. (§§ 33670, 33675; Cal. Const., art. XVI, § 16, subd. (b); cf. *Marek v. Napa*

34

*Community Redevelopment Agency*, *supra*, 46 Cal.3d at p. 1082 [interpreting "indebtedness" to include all existing obligations, including executory ones].) They have no particular right to incur additional future indebtedness. The provisions of part 1.8 of division 24 the Health and Safety Code, which respect the need to satisfy existing indebtedness (see § 34167) while precluding the creation of additional indebtedness (§§ 34162-34163), invade no rights protected by article XIII, section 25.5, subdivision (a)(7)(B) of the state Constitution.

Accordingly, we conclude Proposition 22 does not invalidate the freeze portions of Assembly Bill 1X 26 as they apply to dissolving redevelopment agencies.[17]

## C. *The Constitutionality of Assembly Bill 1X 27*

We turn to Assembly Bill 1X 27. The measure conditions the future operation of redevelopment agencies on continuation payments. (§§ 34193, subd. (a), 34193.2, subd. (a).) Analyzing its operation in light of the constitutional limitations adopted by Proposition 22, we conclude the condition the measure imposes is unconstitutional and Assembly Bill 1X 27 is, accordingly, facially invalid.

The Legislature may not "[r]equire a community redevelopment agency (A) to pay, remit, loan, or otherwise transfer, directly or indirectly, taxes on ad valorem real property and tangible personal property allocated to the agency pursuant to Section 16 of Article XVI to or for the benefit of the State, any agency of the State, or any jurisdiction . . . ." (Cal. Const., art. XIII, § 25.5, subd. (a)(7),

---

**17**     We need not consider any constitutional objections to the freeze portions as they apply to redevelopment agencies whose community sponsors avail themselves of the provisions of Assembly Bill 1X 27 to continue operations because, as discussed below, we conclude Assembly Bill 1X 27 is invalid.

added by Prop. 22, Gen. Elec. (Nov. 2, 2010).) That the continuation payments called for by Assembly Bill 1X 27 will benefit the state and its jurisdictions, i.e., special districts and school districts, is uncontested; for fiscal year 2011-2012, they replace funding the state otherwise would have to supply under Proposition 98 (see § 34194.1, subd. (b)), and in this and future years they go to funds supporting school districts and special districts (§§ 34194, subd. (a), 34194.1, subd. (e), 34194.4).

Moreover, as we shall explain, Assembly Bill 1X 27's continuation payments involve the "direct[] or indirect[]" payment, remittance, loan, or transfer of tax increment allocated to community redevelopment agencies. (Cal. Const., art. XIII, § 25.5, subd. (a)(7).) In interpreting the scope of that constitutional provision, added by initiative, we " 'apply the same principles that govern statutory construction,' " beginning with the text as the best indicator of intent. (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1037.) Where the text is ambiguous we must turn to extrinsic sources, such as the context of adoption and the ballot materials presented to the voters. (*Ibid.*) Here, the text of article XIII, section 25.5, subdivision (a)(7) does not define clearly the intended scope of its prohibition against requiring "direct[] or indirect[]" payment, transfer, etc. of tax revenue. Presented with an ambiguity, we examine the historical backdrop against which the provision was drafted and adopted to discern its meaning.

In the two decades preceding passage of Proposition 22, redevelopment agencies were the subject of repeated ERAF shifts—directives to transfer money to county ERAF's. Each ERAF shift calculated the amount every redevelopment agency owed as a fraction of the tax increment it received. (§§ 33681.7, subd. (a)(2), 33681.9, subd. (a)(2), 33681.12, subd. (a)(2), 33685, subd. (a)(2), 33690, subd. (a)(2), 33690.5, subd. (a)(2); former § 33681, subd. (a)(2) (Stats. 1992,

36

ch. 700, § 1.5, p. 3115); former § 33681.5, subd. (a)(2) (Stats. 1993, ch. 68, § 4, pp. 942-943).)  Notably, however, the shifts did not require payments to come specifically from tax increment; rather, they provided, in language the Legislature copied from year to year:  "To make the allocation required by this section, an agency may use *any funds that are legally available and not legally obligated for other uses*, including, but not limited to, reserve funds, proceeds of land sales, proceeds of bonds or other indebtedness, lease revenues, interest, and other earned income."  (§ 33690.5, subd. (b), italics added [2010-2011 ERAF legislation]; accord, §§ 33681.7, subd. (c), 33681.9, subd. (c), 33681.12, subd. (c), 33685, subd. (c), 33690, subd. (b) [same language in 2002-2003, 2003-2004, 2004-2005, 2008-2009, and 2009-2010 ERAF legislation]; former § 33681, subd. (c) (Stats. 1992, ch. 700, § 1.5, p. 3116) [same language in 1992-1993 ERAF legislation]; former § 33681.5, subd. (c) (Stats. 1993, ch. 68, § 4, p. 943) [same language in 1993-1994 and 1994-1995 ERAF legislation]; see *Los Angeles Unified School Dist. v. County of Los Angeles*, *supra*, 181 Cal.App.4th at p. 421 & fn. 3.)  Thus, although ERAF remittances were calculated as a portion of redevelopment agency tax increment, the Legislature was not particular about the source of funds actually used to make the payments.

Nor was the Legislature concerned with whether it was the redevelopment agencies or their community sponsors that actually made the payments.  Beginning with the fiscal year 2003-2004 ERAF legislation, the Legislature included in each annual measure a provision allowing city councils and county boards of supervisors to agree to make the payments on behalf of their redevelopment agencies.  (§§ 33681.11, subd. (a), 33681.14, subd. (a), 33687, subd. (a), 33692, subds. (a), (b); see, e.g., Sen. Budget & Fiscal Revenue Com., 3d reading analysis of Sen. Bill No. 1045 (2003-2004 Reg. Sess.) as amended July 29, 2003, p. 1 [the ERAF legislation "[a]llows any sponsor city or county to pay their RDA's ERAF

37

contribution in lieu of [the] RDA"].)  Here, too, the Legislature did not specify the source of the funds to be used; a legislative body could apply "any funds that are legally available for this purpose."  (§§ 33681.11, subd. (b), 33681.14, subd. (b), 33687, subd. (b), 33692, subd. (c); see, e.g., Sen. Budget & Fiscal Revenue Com., 3d reading analysis of Sen. Bill No. 1045 (2003-2004 Reg. Sess.) as amended July 29, 2003, pp. 1-2.)

As enacted in the years preceding Proposition 22, then, state ERAF legislation had at least two consistent and defining features:  (1) each payment was calculated in proportion to the amount of net and gross tax increment received by a redevelopment agency, operating in effect as a levy on the receipt of tax increment funds, and (2) the legislation was indifferent as to the actual source of payment, be it from the tax increment itself, other assets a redevelopment agency might have, or any available funds a community sponsor might have.

This indifference made a certain practical sense.  Redevelopment agencies and their community sponsors are conjoined to the extent that, in virtually all instances, the same individuals constitute both the redevelopment agency governing board and the city council or county board of supervisors that created the agency.  The Legislature had no particular reason to care where ERAF payments might come from, and no reason to preclude local governments and redevelopment agencies from deciding in a given year whether the agency or its community sponsor might be better positioned to make payment.

This, then, was the historical context in which the backers of Proposition 22 drafted article XIII, section 25.5, subdivision (a)(7) of the state Constitution. Proposition 1A's passage in 2004 curtailed ERAF shifts aimed at cities and counties, but redevelopment agencies remained subject to them.  Consequently, Proposition 22 was drafted with the specific intent of ending further ERAF shifts of the sort previously imposed on the agencies, and restricting the state's ability to

38

demand back, for schools or other state purposes, a percentage of the money county auditors allocated to redevelopment agencies. Section 2 of Proposition 22 identified among the past practices targeted by the initiative's constitutional amendments ERAF shifts from redevelopment agencies to schools. (Prop. 22, § 2, subd. (d)(3); see also Voter Information Guide, Gen. Elec. (Nov. 2, 2010) Legis. Analyst's analysis of Prop. 22, p. 33.) Section 2.5 of the initiative declared the intent to end such shifts. (Prop. 22, §§ 2, subd. (g), 2.5; see also *id.*, § 9; Voter Information Guide, Gen. Elec. (Nov. 2, 2010) Legis. Analyst's analysis of Prop. 22, p. 34 ["***Reduces State Authority.*** This measure prohibits the state from enacting new laws that require redevelopment agencies to shift funds to schools or other agencies."].)

The text of Proposition 22 mandates that "[t]he provisions of this act shall be liberally construed in order to effectuate its purposes." (Prop. 22, § 11.) Accordingly, we must interpret article XIII, section 25.5, subdivision (a)(7) of the state Constitution in light of the declared intent to end further shifts. Clearly the drafters meant the provision to be at least broad enough to foreclose ERAF legislation of the sort previously enacted, or else the new constitutional protection would amount to an empty gesture, as the Legislature could continue to enact the same legislation. As the voters were explicitly apprised of this intent in both the Legislative Analyst's analysis of the initiative and in the initiative text, they can be regarded as having approved a constitutional prohibition against ERAF shifts like those enacted before 2010.

Given the directive that we adopt a liberal construction as necessary to ensure the purposes of Proposition 22 are carried out, it follows that the constitutional prohibition against "directly or indirectly" requiring transfers of tax increment (Cal. Const., art. XIII, § 25.5, subd. (a)(7)) must extend to legislation that imposes a levy on the receipt of tax increment funds, even if the legislation

39

does not specify that payment must come directly from the redevelopment agency or from its tax increment funds. The prohibition against even "indirect[]" transfers must reasonably be read to extend to legislation that, like the ERAF shifts Proposition 22 was intended to prohibit, gives redevelopment agencies and their community sponsors latitude to decide the source of any payment.

Assembly Bill 1X 27 is such legislation. Like all prior ERAF legislation, it operates as a levy on the receipt of tax increment funds. That is, for each dollar a redevelopment agency receives, a set percentage must be paid back into ERAF's. (See § 34194 [calculating continuation payment as a fraction of the net and gross tax increment each redevelopment agency receives].) In 2011-2012, the levy rate is roughly 34 percent ($1.7 billion out of $5 billion in tax increment); in future years, it is substantially lower ($400 million out of $5 billion equates to 8 percent).

That Assembly Bill 1X 27 allows payment to come either from community sponsors (§ 34194.1, subd. (a)), or from redevelopment agencies pursuant to reimbursement agreements (§ 34194.2), does not distinguish it from past ERAF legislation. Nor does the leeway Assembly Bill 1X 27 grants redevelopment agencies and community sponsors to decide the source from which to make payments diminish the payments' character as a levy on tax increment funds. Reasoning by analogy, income tax is income tax, even if a taxpayer may pay the government out of nonincome assets rather than directly return a portion of his or her income; so too, section 34194 is a levy on the receipt of tax increment for the benefit of the state's subdivisions, whether the levy is paid directly out of the tax increment the redevelopment agency receives, or indirectly out of other assets it or its community sponsor may possess. The source of payment is a distinction without a difference in light of the Legislature's historic indifference to ERAF

40

payment sources and Proposition 22's broad prohibition on even "direct[] or indirect[]" transfers.[18]

As construed by the dissent, however, Proposition 22 would prohibit only funding schemes the Legislature has not employed for nearly a decade, while permitting the very schemes its adoption history plainly demonstrates the initiative was intended to prohibit. The dissent identifies as the saving grace of Assembly Bill 1X 27 the provision allowing community sponsors to make continuation payments. (Conc. & dis. opn., *post*, at p. 15; see § 34194.1.) But every ERAF scheme since 2003 has included that feature. (*Ante*, at p. 37).[19] Consequently, every such ERAF scheme would, under the dissent's construction, remain valid in its entirety even after Proposition 22,[20] and the Legislature could simply have

---

[18] In light of this conclusion, we need not consider the Association's alternate arguments that other provisions of the state Constitution also broadly constrain the Legislature's ability to direct the reallocation of community sponsor funds. (See Cal. Const., art. XIII, §§ 24, subd. (b), 25.5, subd. (a)(1), (3); *id.*, art. XIII B, § 6, subd. (b)(3).)

[19] The Legislature last passed ERAF legislation without such a "community sponsor pays" option in 2002. (Stats. 2002, ch. 1127, §§ 15-16; see also Stats. 1992, chs. 699, 700, pp. 3081-3125; Stats. 1993, ch. 68, pp. 939-955.)

[20] The dissent implies that under its interpretation Proposition 22 would still materially constrain the Legislature in crafting ERAF legislation. Not so. Because under that interpretation a "sponsor pays" option is not prohibited by Proposition 22, no part of any ERAF funding scheme that includes such a provision is invalid. That is, so long as the Legislature includes in its funding scheme one nonprohibited option for payment, all other payment alternatives become optional, and thus lawful. Proposition 22, under that view, would do nothing to prohibit passage of any of the statutes identified by the dissent as potentially invalid (conc. & dis. opn., *post*, at pp. 11-14) so long as they were accompanied by a "sponsor pays" statute like section 33692.

41

reenacted without change 2009's scheme.[21]  Such an interpretation cannot be squared with the available evidence of the drafters' and voters' intent, which was to prohibit these modern raids.  (See Voter Information Guide, Gen. Elec. (Nov. 2, 2010) Legis. Analyst's analysis of Prop. 22, pp. 33-34 [singling out recent ERAF shifts as the sort of raid on tax increment Prop. 22 was intended to foreclose]; Prop. 22, §§ 2, subd. (d)(3), 2.5, 9 [same].)

The dissent justifies this rejection of expressed intent by relying on the grammar and syntax of Proposition 22.  (Conc. & dis. opn., *post*, at pp. 15-16.)  However, "[t]he rules of grammar and canons of construction are but tools, 'guides to help courts determine likely legislative intent.  [Citations.]  And that intent is critical.  Those who write statutes seek to solve human problems.  Fidelity to their aims requires us to approach an interpretive problem not as if it were a purely logical game, like a Rubik's Cube, but as an effort to divine the human intent that underlies the statute.' "  (*Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1017-1018.)  Grammar and syntax thus are a means of gleaning intent, not a basis for preventing its effectuation.  Where, as here, ballot materials clearly demonstrate the drafters' and voters' intent, syntax is not dispositive.

Moreover, nothing in the grammar of article XIII, section 25.5, subdivision (a)(7) of the state Constitution precludes giving the provision its intended effect.  A required "indirect[]" transfer of tax increment by a redevelopment agency may include circumstances where the redevelopment agency, governed by the same people as its community sponsor (see *ante*, p. 9 & fn. 5), must persuade that

---

**21**     That the Legislature did not, and instead believed it needed to add the purported option of dissolution to render its scheme constitutional, suggests the Legislature read Proposition 22 just as we do on this point.

42

sponsor to pay, with or without reimbursement, a specified percentage of the tax increment the agency receives as the price for that receipt.

In her briefing, Matosantos does not focus on whether Assembly Bill 1X 27 involves "direct[] or indirect[]" payments of tax increment funds, but instead on the argument that Assembly Bill 1X 27 does not "[r]equire" payment within the meaning of article XIII, section 25.5, subdivision (a)(7).[22] She acknowledges that Proposition 22 forbids the Legislature from directly requiring payment to special districts and school districts on the state's behalf. She contends, however, that the payments provided for under Assembly Bill 1X 27 are not required but are voluntary and constitutional, because the measure affords local governments an option between payment and dissolution.

This is indeed the way in which Assembly Bill 1X 27 is most distinct from the past ERAF legislation Proposition 22 specifically targeted. Effectively, however, the difference is only a change in the sanction for nonpayment. Before, nonpayment resulted in a range of limitations on a redevelopment agency's operations (see, e.g., §§ 33686, subd. (e), 33691, subd. (e)); now, it will result in dissolution (§ 34195).

This is another distinction without a difference. Assembly Bill 1X 27 on its face imposes not an optional condition but an absolute requirement: going forward, *every* redevelopment agency must have its community sponsor annually pay the portion of its tax increment assessed by the state under Assembly Bill

---

**22** Similarly, when asked at oral argument whether "were [payment] not voluntary," the various constitutional provisions relied on by the Association "would cover the community sponsor funds" and shield them from the state's reach, Matosantos's counsel replied, "I think that's right," but went on to defend Assembly Bill 1X 27 as giving community sponsors a choice whether or not to pay.

1X 27. Cities and counties operating redevelopment agencies, whether agencies that existed before Assembly Bill 1X 27 or agencies they establish for the first time to address new blight, must pay without exception in this and every future year. (See §§ 34194, 34195.) A condition that must be satisfied in order for any redevelopment agency to operate is not an option but a requirement.[23] Such absolute requirements Proposition 22 forbids. (See Cal. Const., art. XIII, § 25.5, subd. (a)(7)(A).)

The Association argues that this conclusion is sufficient to invalidate not only Assembly Bill 1X 27, but also the dissolution provisions of Assembly Bill 1X 26. Not necessarily. How broadly the taint of the invalid exercise of legislative power extends is a question of severability. (See, e.g., *Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296, 319-320 [preserving the state's bailout of local governments notwithstanding an unconstitutional condition placed on that bailout because the one could be severed from the other].) Accordingly, we turn to an analysis of severability and the impact of the invalid continuation payment program (Assem. Bill 1X 27, § 2; Health & Saf. Code, div. 24, pt. 1.9) on the remaining provisions of Assembly Bill 1X 27 and on Assembly Bill 1X 26.

### D. *Severability*

We conclude Assembly Bill 1X 27 is invalid in its entirety, while Assembly Bill 1X 26 may be severed and enforced independently.

---

[23]    Whether to establish a redevelopment agency is voluntary, but that has always been the case. Now, however, if a city or county does establish a redevelopment agency, the agency must through its community sponsor make the payments required under Assembly Bill 1X 27.

In determining whether the invalid portions of a statute can be severed, we look first to any severability clause. The presence of such a clause establishes a presumption in favor of severance. (*Santa Barbara Sch. Dist. v. Superior Court* (1975) 13 Cal.3d 315, 331 [" 'Although not conclusive, a severability clause normally calls for sustaining the valid part of the enactment . . . .' "].) We will, however, consider three additional criteria: "[T]he invalid provision must be grammatically, functionally, and volitionally separable." (*Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 821.) Grammatical separability, also known as mechanical separability, depends on whether the invalid parts "can be removed as a whole without affecting the wording" or coherence of what remains. (*Id.* at p. 822; see also *Santa Barbara*, at pp. 330-331.) Functional separability depends on whether "the remainder of the statute ' "is complete in itself . . . ." ' " (*Sonoma County Organization of Public Employees v. County of Sonoma*, *supra*, 23 Cal.3d at p. 320.) Volitional separability depends on whether the remainder " 'would have been adopted by the legislative body had the latter foreseen the partial invalidation of the statute.' " (*Santa Barbara*, at p. 331; accord, *Gerken v. Fair Political Practices Com.* (1993) 6 Cal.4th 707, 714.)

With respect to the portions of Assembly Bill 1X 27 apart from the section 2 continuation payment program, the Legislature in section 5 included a nonseverability clause: "If Section 2 of this act, or the application thereof, is held invalid in a court of competent jurisdiction, the remaining provisions of this act are not severable and shall not be given, or otherwise have, any force or effect." (Assem. Bill 1X 27, § 5.) Such a clause conclusively negates the possibility of volitional separability: the Legislature would not have enacted the rest of Assembly Bill 1X 27 without the invalid section 2. Accordingly, the remaining provisions of Assembly Bill 1X 27 cannot be severed and are unenforceable as well.

45

In direct contrast, the Legislature in section 4 of Assembly Bill 1X 27 expressed in a severability clause its intent to preserve Assembly Bill 1X 26: "The provisions of Section 2 of this act [Assem. Bill 1X 27] are distinct and severable from the provisions of Part 1.8 (commencing with [Section] 34161) and Part 1.85 (commencing with Section 34170) of Division 24 of the Health and Safety Code [enacted by Assem. Bill 1X 26] and those provisions shall continue in effect if any of the provisions of this act are held invalid." (Assem. Bill 1X 27, § 4.) Grammatically and mechanically, Assembly Bill 1X 26 can be separated from Assembly Bill 1X 27: it was passed as a distinct measure and is codified in a different portion of the Health and Safety Code. Functionally as well, it is separate: the freeze (pt. 1.8) and dissolution (pt. 1.85) procedures can be implemented whether or not the continuation payment program (pt. 1.9) is valid. (Indeed, invalidating pt. 1.9 alone would produce a result no different than if each redevelopment agency and sponsoring local government entity had elected not to make payments and had instead chosen to dissolve.)

The Association concedes grammatical separability but contends Assembly Bills 1X 26 and 1X 27 are neither functionally nor volitionally separable. As to functional separability, the Association posits that the Legislature likely expected Assembly Bill 1X 27 to be upheld and Assembly Bill 1X 26 thus to come into play only for those redevelopment agencies that elected to dissolve. Speculation as to what the Legislature may have expected is immaterial here; the issue under this prong is simply whether Assembly Bill 1X 26 is complete in itself such that it can be enforced notwithstanding Assembly Bill 1X 27's invalidity. Assembly Bill 1X 26 outlines an independent mechanism for redevelopment agency dissolution that does not depend in any way on Assembly Bill 1X 27.

Alternatively, the Association identifies a small handful of provisions in Assembly Bill 1X 26 that are meaningful only if Assembly Bill 1X 27 is valid.

46

(See §§ 34172, subd. (a)(2) [permitting communities to create new redevelopment agencies provided they make Assem. Bill 1X 27 continuation payments], 34178.7, 34188.8, 34191, subd. (a) [governing redevelopment agencies that fail to keep up with continuation payments].)  The provision allowing communities to establish new redevelopment agencies subject to continuation payments under Assembly Bill 1X 27 is invalid for precisely the same reasons applicable generally to Assembly Bill 1X 27.  Its invalidity does not, however, affect the rest of Assembly Bill 1X 26, as the provision is grammatically, functionally, and volitionally separable from the rest of Assembly Bill 1X 26.  (See Assem. Bill 1X 26, § 12 [providing for internal severability for Assem. Bill 1X 26].)  Those provisions applicable only to redevelopment agencies that start but then cease continuation payments are not invalid, but are simply irrelevant; in light of Assembly Bill 1X 27's invalidity, no redevelopment agency will ever become subject to them. Neither set of provisions impairs Assembly Bill 1X 26's functional separability.

As for volitional separability, the Association points to evidence that the Legislature rejected Governor Brown's proposal simply to end redevelopment agencies in favor of the two-bill package it ultimately passed.  The Association further quotes statements from various individual legislators during the June 15, 2011, floor debates suggesting they (1) viewed Assembly Bills 1X 26 and 1X 27 as a package deal (remarks of Sen. Steinberg; remarks of Assemblyman Blumenfield) and (2) preferred to mend redevelopment rather than end it (remarks of Sen. Hancock).

We may accept that the Legislature treated Assembly Bills 1X 26 and 1X 27 as a package, and accept as self-evident that the Legislature preferred dissolution with an option to buy a reprieve over dissolution without any such option; after all, it passed Assembly Bill 1X 27 in addition to Assembly Bill 1X 26, when it could have opted for some variation of Governor Brown's outright

47

dissolution proposal. We need not further consider what weight, if any, to accord the statements of individual legislators because this evidence goes to answering the wrong question. The issue, when assessing volitional separability, is not whether a legislative body would have preferred the whole to the part; surely it would have, and the legislative history the Association points to tells us no more than that. Instead, the issue is whether a legislative body, knowing that only part of its enactment would be valid, would have preferred that part to nothing, or would instead have declined to enact the valid without the invalid. (See, e.g., *Gerken v. Fair Political Practices Com.*, *supra*, 6 Cal.4th at p. 719; *Calfarm Ins. Co. v. Deukmejian*, *supra*, 48 Cal.3d at p. 822; *Sonoma County Organization of Public Employees v. County of Sonoma*, *supra*, 23 Cal.3d at p. 320.)

As to that question, the interstatutory severability clause the Legislature enacted is conclusive. (See Assem. Bill 1X 27, § 4.) It is no generic severability clause, providing nonspecifically that if any provision of a measure is invalidated the remaining portions of an act should remain in force. (Cf. § 34168, subd. (b).) Rather, it deals with the precise severability question we face: whether, if section 2 of Assembly Bill 1X 27 were to be invalidated, the Legislature would have wanted the provisions of Assembly Bill 1X 26 to remain in force. The interstatutory severability clause answers that question unequivocally in the affirmative: Assembly Bill 1X 27, section 2 is severable from Assembly Bill 1X 26, and the Legislature intended the freeze and dissolution provisions to continue in effect notwithstanding the invalidation of the continuation payment program. (Assem. Bill 1X 27, § 4; see also Assem. Budget Com., Conc. in Sen. Amend., analysis of Assem. Bill 1X 27 (2011-2012 1st Ex. Sess.) as amended June 14, 2011, p. 4 [highlighting that while most provisions of Assem. Bill 1X 27 were not severable, the bill *was* severable from "[Assem. Bill 1X 26], which eliminates redevelopment. Thus, if provisions of this bill are found invalid, the

48

provisions of the first bill could remain in effect."]; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill 1X 27 (2011-2012 1st Ex. Sess.) as amended June 15, 2011, p. 6 [same].)[24]  Accordingly, whatever individual legislators may have said at one point or another, what the Legislature actually *did* establishes it would have passed Assembly Bill 1X 26 irrespective of the passage of Assembly Bill 1X 27, and that Assembly Bill 1X 26 is volitionally separable.  Consequently, it is severable.

We summarize our conclusions concerning the constitutional landscape. The Legislature, pursuant to its plenary power to establish or dissolve local agencies and subdivisions as it sees fit, may, but need not, authorize redevelopment agencies.  (Cal. Const., art. IV, § 1.)  If it does choose to authorize such agencies, it may, but need not, authorize their receipt of property tax increment.  (*Id.*, art. XVI, § 16.)  However, if it authorizes such agencies and, moreover, authorizes their receipt of tax increment, it may not thereafter require that such allocated tax increment be remitted for the benefit of schools or other local agencies.  (*Id.*, art. XIII, § 25.5, subd. (a)(7)(A).)  Assembly Bill 1X 26

---

**24**     As discussed, Assembly Bill 1X 27 contains, in addition to an interstatutory severability clause (Assem. Bill 1X 27, § 4), an intrastatutory nonseverability clause that invalidates the remainder of Assembly Bill 1X 27 if Assembly Bill 1X 27's section 2 is struck down.  (Assem. Bill 1X 27, § 5.)  The Association and amicus curiae Community Redevelopment Agency of the City of Los Angeles suggest the intrastatutory nonseverability clause invalidates the interstatutory severability clause.  But the clear intent of an intrastatutory nonseverability clause like section 5 of Assembly Bill 1X 27 is to prevent the other *substantive* provisions of an enactment from taking effect; it is not to invalidate other metaprovisions of an enactment—such as section 5 itself—that speak to the effectiveness of provisions of an enactment in the event of partial invalidation. The section 4 interstatutory severability clause, another metaprovision, is likewise exempt from the invalidating reach of section 5.

49

respects these narrow limits on the Legislature's power; Assembly Bill 1X 27 does not.

### E. *The Future Implementation of Assembly Bill 1X 26*

When we accepted jurisdiction over the Association's petition, we stayed implementation of the provisions of part 1.85 of division 24 of the Health and Safety Code.  (§§ 34170-34191.)  Numerous critical deadlines contained in that part have passed and can no longer be met.  (See §§ 34170, subd. (a) [all provisions in pt. 1.85 are operative on Oct. 1, 2011, unless otherwise specified], 34172, subd. (a)(1) [dissolving redevelopment agencies], 34173 [creating successor agencies], 34175, subd. (b) [transferring redevelopment agency assets to successor agencies], 34177, subd. (*l*)(2)(A) [requiring successor agency to prepare a draft obligation payment schedule by Nov. 1, 2011].)

This impossibility ought not to prevent the Legislature's valid enactment from taking effect.  As Matosantos urges, and the Association does not contest, we have the power to reform a statute so as to effectuate the Legislature's intent where the statute would otherwise be invalid.  (*Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 660-661.)  Here, the problem is not invalidity but impossibility:  the need, recognized by both sides, to put to rest constitutional questions concerning these measures, when combined with a stay issued to preserve the court's jurisdiction to issue meaningful relief, has rendered it impossible for the parties and others affected to comply with the legislation's literal terms.  By exercising the power of reform, however, we may as closely as possible effectuate the Legislature's intent and allow its valid enactment to have its intended effect.  Reformation is proper when it is feasible to do so in a manner that carries out those policy choices clearly expressed in the original legislation, and when the legislative body would have preferred reform to ineffectuality.  (*Id.*

50

at p. 661.)  We think it clear that (1) the Legislature would have preferred Assembly Bill 1X 26 to take effect on a delayed basis, rather than not at all, and (2) the timeline provided for in Assembly Bill 1X 26 can be reformed in a fashion that cleaves sufficiently to legislative intent.

In recognition of the eventuality that upholding any part of Assembly Bill 1X 26 or 1X 27 would require us to address the impact of our stay on their statutory deadlines, we solicited input from the parties as to appropriate new deadlines.  Because we have invalidated Assembly Bill 1X 27, we need consider only the extent to which deadlines in part 1.85 must be extended to account for the stay, while taking effect as promptly as the Legislature intended.

The parties' proposals involve elaborate schedules shifting each deadline in part 1.85 by a varying number of days.  We decline to adopt any of the proposed schedules, whose implementation would overly complicate future compliance. Instead, we note that our stay of part 1.85 has been in place for four months and has delayed operation of that part of Assembly Bill 1X 26 by a like amount.  By reforming Assembly Bill 1X 26 to extend each of its deadlines by the duration of our stay, we retain the relative spacing of events originally intended by the Legislature and simplify compliance for all affected parties.

Accordingly, we exercise our power of reformation and revise each effective date or deadline for performance of an obligation in part 1.85 of division 24 of the Health and Safety Code (§§ 34170-34191) arising before May 1, 2012, to take effect four months later.[25]  By way of example, under section 34170,

---

[25]     We make an exception for actions that were to be taken by September 1, 2011.  (See, e.g., § 34173, subd. (d)(1).)  There, we extend the deadline to 15 days after the issuance of our opinion and lifting of the stay, i.e., January 13, 2012, rather than January 1.

51

subdivision (a), all provisions in part 1.85 were to be operative on October 1, 2011, unless otherwise specified; our reformation makes them operative on February 1, 2012.  The draft obligation payment schedules due on November 1, 2011, under section 34177, subdivision (*l*)(2)(A), are now due March 1, 2012.[26]  Successorship agency board membership, required to be determined by January 1, 2012 (§ 34179, subd. (a)), must be complete by May 1, 2012.  Similar reformations apply to all other imminent obligations throughout part 1.85.  In contrast, no reformation is needed for future obligations to be carried out in subsequent fiscal years.  (E.g., §§ 34179, subds. (j)-(*l*) [provisions for successorship agency boards in 2016 and later], 34182, subd. (c)(3) [ongoing county auditor-controller obligation to prepare estimates of allocations and distributions every Nov. 1 and May 1].)

Where a provision imposes obligations in both this and subsequent fiscal years, we reform the provision only as it relates to obligations arising before May 1, 2012.  Thus, for example, section 34183 requires certain calculations from county auditor-controllers by January 16, 2012, and June 1, 2012, for this fiscal year, and on January 16 and June 1 in subsequent years.  (§ 34183, subd. (a).)  We reform the January 16, 2012, deadline by extending it to May 16, 2012, and leave the remaining deadlines unchanged.  Likewise, section 34185 provides for distributions on each January 16 and June 1; we reform the first distribution deadline by extending it to May 16, 2012, and leave all subsequent deadlines unchanged, so that future distributions may occur on the schedule, and in the same fiscal year, originally contemplated by the Legislature.

---

**26**    In contrast, the period to be covered by these schedules—through July 1, 2012, the end of the fiscal year—is not an obligation and is thus unchanged by our reformation.  (See § 34177, subd. (*l*)(2)(A).)

## III.  DISPOSITION

For the foregoing reasons, we discharge the order to show cause, deny the Association's petition for a peremptory writ of mandate with respect to Assembly Bill 1X 26, except for Health and Safety Code section 34172, subdivision (a)(2), and grant its petition with respect to Assembly Bill 1X 27.  We direct issuance of a peremptory writ compelling the state Director of Finance and state Controller not to implement Health and Safety Code sections 34172, subdivision (a)(2) and 34192-34196.  We extend all statutory deadlines contained in Health and Safety Code, division 24, part 1.85 (§§ 34170-34191) and arising before May 1, 2012, by four months.  Given the urgency of the matters addressed by the Association's petition, our judgment is final forthwith.  (See, e.g., *Senate of the State of Cal. v. Jones* (1999) 21 Cal.4th 1142, 1169.)

**WERDEGAR, J.**

**WE CONCUR:**

**KENNARD, J.**
**BAXTER, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**

53

**CONCURRING & DISSENTING OPINION
BY CANTIL-SAKAUYE, C. J.**

I concur in parts II.A., II.B., and II.E. of the majority opinion, but respectfully dissent from the remainder of the opinion concerning the constitutionality of Assembly Bill 1X 27.[1]  The majority concludes that Assembly Bill 1X 27 is unconstitutional because it violates article XIII, section 25.5, subdivision (a)(7)(A) of the California Constitution (added by Prop. 22, approved by voters, Gen. Elec. (Nov. 2, 2010)).  I part with the majority on this point because, although it may be possible that Assembly Bill 1X 27 may cause some community sponsors[2] to utilize funds otherwise protected by Proposition 22, petitioners have not met their burden of supporting this contention.  In fact, they provide documentation that suggests quite the opposite.  Moreover, on its face, nothing in Assembly Bill 1X 27 compels community sponsors to violate Proposition 22.  Ultimately, the majority's conclusion rests on an impermissibly

---

[1]  This bill added part 1.9 to division 24 of the Health and Safety Code and enacted 14 statutes, Health and Safety Code sections 34192, 34192.5, 34193, 34193.1-34193.3, 34194, 34194.1-34194.5, 34195, 34196.  For sake of consistency, I will use the same designation used by the majority, Assembly Bill 1X 27, in making general references to these statutes.

[2]  Also consistent with the majority's terminology, I will use the term "community sponsor" to describe the local government body, such as a city or county, that may elect to make payments required by Assembly Bill 1X 27 in order to continue redevelopment practices.

1

broad reading of Proposition 22 plain language, on unsupported assumptions concerning the intent behind Proposition 22, and on speculation that constitutional problems *could* result from the implementation of Assembly Bill 1X 27. In doing so, the majority does not apply well-settled rules of statutory and constitutional construction.

## I. Facial Challenges and the Rules of Statutory and Constitutional Construction

I first address the applicable rules concerning petitioners' facial challenge of Assembly Bill 1X 27 and the interpretative framework governing challenges to the constitutionality of the statutes enacted by this bill.

### A. Facial Challenges versus "As Applied" Challenges

Generally, a facial challenge to the constitutionality of legislation "considers only the text of the measure itself, not its application to the particular circumstances of an individual." (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.) In contrast, an "as applied" challenge to the constitutionality of legislation involves an otherwise facially valid measure that has been applied in a constitutionally impermissible manner. This type of challenge "contemplates analysis of the facts of a particular case or cases to determine the circumstances in which the [measure] has been applied and to consider whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right." (*Ibid.*)

Petitioner California Redevelopment Association concedes that it is making a facial challenge to Assembly Bill 1X 27.[3] "A facial challenge to a legislative

---

[3] Given the procedural posture of this case — an application to declare the statutes enacted by Assembly Bill 1X 26 and Assembly Bill 1X 27 unconstitutional after we have substantially stayed their enforcement — it seems

*(footnote continued on next page)*

2

Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." (*United States v. Salerno* (1987) 481 U.S. 739, 745.) The circumstance that an act "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid" under a facial challenge. (*Ibid.*)

### B. *Petitioners' Burden Under a Facial Challenge*

In describing petitioners' burden, we have sometimes articulated differing standards. Under the strictest standard, " '[t]o support a determination of facial unconstitutionality, voiding the statute as a whole, petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute . . . . Rather, petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions.' " (*Arcadia Unified School Dist. v. State Dept. of Education* (1992) 2 Cal.4th 251, 267, quoting *Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 180-181.) Under the more lenient standard, petitioners need only demonstrate that the measure "conflicts with [the Constitution] 'in the *generality* or *great majority* of cases.' [Citations.]" (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1126.)

---

*(footnote continued from previous page)*

very difficult, if not impossible, for petitioners to perfect an "as applied" challenge by arguing that the measures have been or will be enforced in an unconstitutional manner in any particular case. (*Tobe v. City of Santa Ana*, *supra*, 9 Cal.4th at pp. 1092-1093.) In any event, as I will explain in greater detail in part II.D., the documentation that petitioner presents does not establish that the enforcement of Assembly Bill 1X 27 necessarily will result in a violation of Proposition 22 in any particular case.

It is unclear which standard the majority employs, but, as I will explain, I believe petitioners have not met their burden under either standard concerning the alleged unconstitutionality of the statutes enacted by Assembly Bill 1X 27.

### C. The Applicable Interpretative Rules of Constitutional and Statutory Construction

In assessing the merits of petitioners' facial challenge, we are governed by a specific interpretative framework that constrains how we must view the interaction between the statutes enacted by Assembly Bill 1X 27 and Proposition 22.

As the majority notes, Proposition 22, which added subdivision (a)(7)(A) to section 25.5 of article XIII of the California Constitution, limits what the Legislature may do with respect to redevelopment agency tax increment funds. Respondent Matosantos correctly argues that Proposition 22 imposes a constitutionally based limitation on the powers of the Legislature, and we must construe such limits strictly. (*White v. Davis* (2003) 30 Cal.4th 528, 539-540; *Pacific Legal Foundation*, *supra*, 29 Cal.3d at p. 180.) This strict construction of the constitutional limits on legislative power is required because " ' "we do not look to the Constitution to determine whether the legislature is authorized to do an act, but only to see if it is prohibited." [Citation.]' " (*White v. Davis*, *supra*, at p. 539, quoting *Methodist Hosp. of Sacramento v. Saylor* (1971) 5 Cal.3d 685, 691.) Given that legislative power is " ' "practically absolute," ' " any constitutional limitations on this power are strictly construed and may not be given effect as against the general power of the Legislature " ' "unless such limitations clearly inhibit the act in question." ' " (*Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1255 (*Amwest*).) Accordingly, in the face of a constitutionally based limitation on its power, " ' "[i]f there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the

4

Legislature's action." ' " (*White v. Davis*, *supra*, at p. 539, quoting *Methodist Hosp. of Sacramento v. Saylor*, *supra*, at p. 691.)

Furthermore, although " '[t]he judiciary's traditional role of interpreting ambiguous statutory language or "filling in the gaps" of statutory schemes is . . . as applicable to initiative measures as it is to measures adopted by the Legislature,' " we have warned that "the initiative power is strongest when courts give effect to the voters' formally expressed intent, without speculating about how they might have felt concerning subjects on which they were not asked to vote." (*Ross v. RagingWire Telecommunications, Inc.* (2008) 42 Cal.4th 920, 930, quoting *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1202.) Therefore, unless "the text is ambiguous and supports multiple interpretations," our court must rely upon "the text as the first and best indicator of intent." (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 321.) Even "a command that a constitutional provision or a statute be liberally construed 'does not license either enlargement or restriction of its evident meaning' " because unambiguous language requires no need for engaging in liberal construction.[4] (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 844, quoting *People v. Cruz* (1974) 12 Cal.3d 562, 566.)

As for our interpretation of the statutes enacted by Assembly Bill 1X 27, we presume the constitutionality of a legislative act, resolving all doubts in its favor, and we must uphold it unless a " 'conflict with a provision of the state or federal Constitution is clear and unquestionable.' " (*Amwest*, *supra*, 11 Cal.4th at p. 1252.) This presumption is particularly appropriate when, as here, "the statute

---

[4] In interpreting Proposition 22, the majority opinion fails to acknowledge this particular rule of interpretation.

5

represents a considered legislative judgment as to the appropriate reach of the constitutional provision." (*Pacific Legal Foundation v. Brown*, *supra*, 29 Cal.3d at p. 180; see Legis. Analyst's Off., The 2011-12 Budget: Should California End Redevelopment Agencies? (Feb. 9, 2011) p. 12 [warning the Legislature that Prop. 22 and other measures limit "the state's authority to shift property taxes and/or redirect tax increment revenues" and that "[d]rafting a plan for local governments to carefully unwind their redevelopment programs and successfully navigate the many legal, administrative, and financial factors will be complex"].)

From these principles, I conclude that our analysis must begin with the presumption that Assembly Bill 1X 27 is constitutionally valid unless it conflicts with the state Constitution in a clear and unquestionable manner. Because Proposition 22 restricts the Legislature's power, it must be strictly construed. But even though Proposition 22 contains a demand that it be liberally construed, as with any statute, we cannot give Proposition 22 an interpretation beyond its formally expressed intent if its language is clear.

## II. Interpreting Proposition 22

I conclude that, even assuming the circumstances most favorable to petitioners — applying the more lenient standard for facial challenges and broadly construing Proposition 22 — petitioners have failed to sustain their burden to show that Assembly Bill 1X 27 is unconstitutional.

### A. *Proposition 22 and Assembly Bill 1X 27 Generally*

Proposition 22 prohibits the Legislature from requiring "a community redevelopment agency . . . to pay, remit, loan, or otherwise transfer, directly or indirectly, taxes on ad valorem real property and tangible personal property allocated to the agency pursuant to Section 16 of Article XVI [i.e., its tax increment funds]." (Cal. Const., art. XIII, § 25.5, subd. (a)(7)(A).) Given the

6

rules of interpretation described *ante*, it is important to note what, exactly, this constitutional provision expressly prohibits: the Legislature cannot require *a redevelopment agency* to directly or indirectly reallocate its tax increment funds.

In contrast, Assembly Bill 1X 27 does not require or compel any redevelopment agency to make any payment. It specifically provides that the community sponsor, whether it be a city, county, or other local government entity, "may use any available funds not otherwise obligated for other uses" to make a payment. (Health & Saf. Code, § 34194.1, subd. (a).)[5] The payments required by Assembly Bill 1X 27 to establish or continue redevelopment agencies are to be made by community sponsors, not redevelopment agencies. Although Assembly Bill 1X 27, through the enactment of section 34194.2, permits a community sponsor to enter into an agreement with its redevelopment agency to use its tax increment to fund the payment, such agreements are not compelled or required by Assembly Bill 1X 27.[6] Moreover, nothing in Assembly Bill 1X 27 requires that a

---

[5] Unless otherwise noted, all further statutory references are to the Health and Safety Code.

[6] Petitioner County of Santa Clara argues that one of the statutes enacted by Assembly Bill 1X 27 is unconstitutional because section 34194.2 allows loans of tax increment funds to finance Assembly Bill 1X 27 payments in violation of article XVI, section 16, of the state Constitution, which mandates that tax increment funds be used to finance redevelopment projects. But section 34194.2 cannot be facially unconstitutional because its language is permissive — "a city or county *may* enter into an agreement with the redevelopment agency" to make such loans of local tax increment funds. (Italics added.) This provision, therefore, does not "inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." (*Pacific Legal Foundation v. Brown*, *supra*, 29 Cal.3d 168, 181.) Moreover, even under the more liberal standard for facial challenges, as I will explain in part II.D., petitioners have failed to show that section 34194.2 will generate potential violations of the state Constitution " 'in the *generality* or *great majority* of cases.' " (*Guardianship of Ann S.*, *supra*, 45 Cal.4th 1110, 1126.)

7

redevelopment agency's tax increment be reallocated, either directly or indirectly, to satisfy the payments.  Instead, the measure is neutral as to the source of funds for the Assembly Bill 1X 27 payments.**7**

### B. *The Applicable Language of Proposition 22 Does Not Require a Liberal Construction*

The majority asserts that California Constitution article XIII, section 25.5, subdivision (a)(7) (as added by Prop. 22) is ambiguous, thereby requiring an examination of its history to ascertain its intended meaning.  The majority identifies as ambiguous Proposition 22's use of the words "indirectly" and "directly," especially in view of prior statutory shifts involving ERAF's pursuant

---

**7**     For this same reason, Assembly Bill 1X 27's revenue-neutral provision, clarifying that a community sponsor "may use any available funds not otherwise obligated for other uses" to make the Assembly Bill 1X 27 payments (Health & Saf. Code, § 34194.1, subd. (a)), also forecloses petitioners' facial challenge based on other provisions of Proposition 22 and on Proposition 1A (as approved by voters, Gen. Elec. (Nov. 2, 2004)).  Proposition 1A amended the state Constitution to limit the Legislature's ability to reallocate property taxes unless passed by a two-thirds vote, but nothing in Assembly Bill 1X 27 requires the payments to come from this source.  In addition, the mere fact that section 34194.1, subdivision (b) labels its payments as "property taxes" for a single fiscal year, for the purpose of offsetting the state's school funding obligations in that year, does not violate Proposition 1A as petitioner County of Santa Clara argues.  No provision of Assembly Bill 1X 27 alters the existing distribution of local property tax revenue actually collected by counties, and section 34194.1's terminology is simply an extension of the "accounting device" established by the Educational Revenue Augmentation Funds (ERAF's).  (*Los Angeles Unified School Dist. v. County of Los Angeles* (2010) 181 Cal.App.4th 414, 426.)  Similarly, another provision of Proposition 22 amended the state Constitution to ensure that the Legislature could not "reallocate, transfer, borrow, appropriate, restrict the use of, or otherwise use the proceeds of any tax imposed or levied by a local government solely for the local government's purposes." (Cal. Const., art. XIII, § 24, subd. (b).)  But nothing in Assembly Bill 1X 27 redirects the proceeds of an otherwise dedicated local tax toward making the Assembly Bill 1X 27 payments.

to which the Legislature diverted redevelopment agency tax increment revenue to fund schools.

The majority notes that a distinct provision in each of those prior ERAF shifts, going back to 2003, allowed the shift to be funded in a revenue-neutral and source-neutral manner and without necessarily using tax increment funds. For instance, in the legislation enacting the last ERAF shift, which directly led to Proposition 22's placement on the November 2010 ballot, the Legislature included statute that did not require the ERAF shift payment to come specifically from tax increment funds, but instead provided that in order "[t]o make the allocation required by this section, an agency may use *any funds that are legally available and not legally obligated for other uses*, including, but not limited to, reserve funds, proceeds of land sales, proceeds of bonds or other indebtedness, lease revenues, interest, and other earned income." (Health & Saf. Code, § 33690.5, subd. (b), italics added.) It also included a "catch-all" statute that allowed a local legislative body, *in lieu of the redevelopment agency*, to make the ERAF payments "from *any funds that are legally available for this purpose*." (Health & Saf. Code, § 33692, subd. (c), italics added.) Accordingly, the majority reasons that Proposition 22's language, prohibiting the direct or indirect transfer of tax increment funds, is specifically intended to stop the kind of payments described by Assembly Bill 1X 27.

However, Proposition 22's plain language simply does not prohibit the kind of payments described by Assembly Bill 1X 27.

Proposition 22 prohibits the Legislature from requiring "*a community redevelopment agency* . . . to pay, remit, loan, or otherwise transfer, directly or indirectly," its tax increment funds. (Cal. Const., art. XIII, § 25.5, subd. (a)(7)(A), italics added.) As previously described, however, the Assembly Bill 1X 27 payments must be made by community sponsors, not redevelopment agencies.

9

Nothing in Assembly Bill 1X 27 requires *a redevelopment agency* "to pay, remit, loan, or otherwise transfer, directly or indirectly," its tax increment funds. If Proposition 22 intended to prohibit the payments described by Assembly Bill 1X 27, it could have been written to prohibit the Legislature from requiring *a local government body* or community sponsor "to pay, remit, loan, or otherwise transfer, directly or indirectly," its tax increment funds. But it was not drafted that way.

Additionally, nothing in Proposition 22 restricts the Legislature from using tax increment funds as the *basis* for a particular calculation. Certainly, Assembly Bill 1X 27 uses the size of tax increment funds as a "yardstick" or, as the majority characterizes it a "levy," to determine the size of the described payments, but such use is not prohibited by Proposition 22's plain language.

Pointedly, the word "levy" appears nowhere in Proposition 22. Instead, the drafters of Proposition 22 listed a very specific catalog of actions, prohibiting the Legislature from requiring a redevelopment agency "to pay, remit, loan, or *otherwise transfer*" its tax increment funds. (Cal. Const., art. XIII, § 25.5, subd. (a)(7)(A), italics added.) " '[W]hen a statute contains a list or catalogue of items, a court should determine the meaning of each by reference to the others, giving preference to an interpretation that uniformly treats items similar in nature and scope. [Citations.] In accordance with this principle of construction, a court will adopt a restrictive meaning of a listed item if acceptance of a more expansive meaning would make other items in the list unnecessary or redundant, or would otherwise make the item markedly dissimilar to the other items in the list. [Citations.]' " (*Commission on Peace Officer Standards & Training v. Superior Court* (2007) 42 Cal.4th 278, 294, quoting *Moore v. California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1011-1012.) Placing aside the problem that the list of verbs applies only to redevelopment agencies, expansively reading the word "levy" into the list of prohibited actions would conflict with the other words

10

in the list describing actions that "otherwise transfer" tax increment funds, making the remaining words unnecessary or redundant. If Proposition 22 truly intended to prevent the Legislature from using tax increment funds as the basis for *calculating* certain payments or as the basis of a *levy*, it could have been written to prohibit the Legislature from requiring "a community redevelopment agency to pay, remit, loan, or otherwise transfer, directly or indirectly," its tax increment funds "*or to levy such revenues or use them as the basis for certain remittances.*" But again, it was not drafted that way.

### C. A Liberal Construction of Proposition 22 Does Not Render Assembly Bill 1X 27 Facially Unconstitutional

Even if Proposition 22's use of the words "directly" or "indirectly" is ambiguous and raises colorable questions of whether Proposition 22 might apply to community sponsors or whether it might prohibit the use of tax increment funds as a "yardstick" or "levy," I still cannot agree with the majority's conclusion that Assembly Bill 1X 27 is unconstitutional.

#### 1. A Broad Construction of the Word "Indirectly"

The express obligation to make the payments to establish or continue redevelopment agencies rests on community sponsors, and not on redevelopment agencies themselves and Assembly Bill 1X 27 does not expressly compel the use of tax increment funds to make the Assembly Bill 1X 27 payments. However, the majority relies on the history of prior ERAF legislation and apparently infers that Proposition 22 intended its use of the word "indirectly" to cover the entire scenario posed by the Assembly Bill 1X 27 payments. But a careful dissection of the 2009 ERAF legislation, much of which was the immediate trigger for Proposition 22, illustrates why this reasoning is erroneous.

As relevant here, the 2009 ERAF shift legislation covered two fiscal years and was comprised of four different statutes. (Assem. Bill No. 26 (2009-2010 4th

11

Ex. Sess.) enacted as Stats. 2009, 4th Ex. Sess., ch. 21, §§ 6-9; §§ 33690 [for fiscal year 2009-2010], 33690.5 [for fiscal year 2010-2011], 33691, and 33692.)**8** A review of the first three of these statutes reveals that the Legislature clearly targeted redevelopment agencies and their tax increments as the funding source for the ERAF shifts. But the fourth statute, section 33692, was a stand-alone, catch-all provision that, unlike the other three statutes, expressed a revenue-neutral stance as to the money used to fund the ERAF shifts. As I will explain, no liberal construction of Proposition 22 can stretch to prohibit similar revenue-neutral provisions enacted by Assembly Bill 1X 27.

The first two statutes specify that a redevelopment agency "*shall* remit" the ERAF shifts, and that payments were to be based directly on a proportion of the redevelopment agency's net tax increment. (§§ 33690, subd. (a), 33690.5, subd. (a), italics added.) Both statutes state that the ERAF remittance for each fiscal year is "declared to be an indebtedness of the redevelopment project to which they relate, payable from" tax increment funds. (§§ 33690, subd. (e), 33690.5, subd. (e).) Each statute also states, however, that the redevelopment agency could make the payment by using any of the redevelopment agency's other available revenue sources. (§§ 33690, subd. (b), 33690.5, subd. (b).) Each further declares, "[i]t is the intent of the Legislature, in enacting this section, that these

---

**8** Over a year later, the Legislature added a fifth statute, section 33691.5, that allowed indebted redevelopment agencies to enter into a long-term payment plan with the state to eventually pay off any outstanding ERAF remittances for fiscal years 2009-2010 and 2010-2011. (Sen. Bill No. 863 (2009-2010 Reg. Sess.) enacted as Stats. 2010, ch. 722, § 8.) Because this measure was signed into law on October 19, 2010, well after Proposition 22 qualified for placement on the November 2, 2010 election ballot, section 33691.5 could not have affected the intent of the drafters of Proposition 22. Accordingly, it bears no relevance to our analysis of what Proposition 22 intended to prohibit.

allocations *directly or indirectly* assist in the financing or refinancing, in whole or in part, of the community's redevelopment project pursuant to Section 16 of Article XVI of the California Constitution." (§§ 33690, subd. (f), 33690.5, subd. (f), italics added.)

Under both the plain language of Proposition 22 and a liberal construction of its use of the word "indirectly," the Legislature is clearly prohibited from enacting future legislation identical to these first two statutes. Because these first two statutes, sections 33690 and 33690.5, compelled redevelopment agencies to make the ERAF remittances and defined the revenue shifts, whether from tax increment funding or other available revenue, as part of the redevelopment agency's indebtedness, payable from tax increment funds, the drafters of Proposition 22 responded by including language that would prohibit the Legislature from enacting future legislation requiring "*a community redevelopment agency . . . to pay, remit, loan, or otherwise transfer, directly or* indirectly," its tax increment funds. (Cal. Const., art. XIII, § 25.5, subd. (a)(7)(A), italics added.)

To the extent that sections 33690 and 33690.5 also provide that the redevelopment agency could make the ERAF remittances by using any of the agency's other revenue sources not related to tax increment funds, a liberal construction of Proposition 22 also would forbid similar measures in the future. Although a redevelopment agency's use of otherwise available, non-tax-increment revenue cannot be a compelled *direct* remittance of its tax increment funds, such use may constitute an *indirect* remittance of its tax increment funds by imposing an additional, immediate financial obligation on the redevelopment agency's otherwise fixed budget. Thus, the provisions in these first two statutes allowing the ERAF remittance to be funded by other redevelopment agency revenue would be prohibited by Proposition 22 because such a provision would require "*a*

13

*community redevelopment agency . . .* to pay, *remit*, loan, or otherwise transfer, directly or *indirectly*," its tax increment funds.  (Cal. Const., art. XIII, § 25.5, subd. (a)(7)(A), italics added.)

A third statute from the 2009 ERAF legislation allows a redevelopment agency to make partial ERAF remittances if its existing indebtedness made it impossible for the agency to fund the entire ERAF shift.  (§ 33691.)  "Existing indebtedness" is defined in this section as a financial obligation incurred by the redevelopment agency that required "the payment of which is to be made in whole or in part, *directly or indirectly*, out of" tax increment funds.  (§ 33691, subd. (a)(1), italics added.)  This section contains a provision allowing the redevelopment agency to obtain a loan from its local government for the ERAF payment, but it also specifies that this loan becomes part of the agency's indebtedness that "*shall* be payable from tax revenues apportioned to the agency pursuant to Section 33670 [i.e., tax increment funds], and any other funds received by the agency."  (§ 33691, subd. (d)(2), italics added.)

Again, both the plain language of Proposition 22 and a liberal construction of it would prohibit this kind of statute in the future.  The loan anticipated by section 33691 must be directly tied into a redevelopment agency's tax increment funds, and the loan also is indirectly tied to tax increment funding by virtue of continued reliance on "other funds received by the agency."  (§ 33691, subd. (d)(2).)  Pointedly, Proposition 22 mirrors the same "directly or indirectly" language used by section 33691, subdivision (a)(1).  A future version of this third statute, therefore, would be prohibited under Proposition 22 because it would require "*a community redevelopment agency . . .* to pay, remit, *loan*, or otherwise transfer, *directly or indirectly*," its tax increment funds.  (Cal. Const., art. XIII, § 25.5, subd. (a)(7)(A), italics added.)

14

Finally, a fourth statute from the 2009 ERAF legislation is markedly different from its sister statutes. This fourth statute contains a catch-all phrase allowing a local "legislative body" to make the ERAF remittances on behalf of the redevelopment agency using "any funds that are legally available for this purpose." (§ 33692, subd. (c).) The statute's revenue source is neutral and allows payment with "no strings attached," in the sense that it contains no provision, unlike section 33691, subdivision (d), that converts the payment into an redevelopment agency debt that is payable, either directly or indirectly, through its tax increment funds. To use the majority's terminology, this fourth statute acts as a kind of "levy" on tax increment funds that can be paid by a local government body using any available revenue source.

Here, I expose the Achilles' heel of the majority's reasoning concerning the unconstitutionality of Assembly Bill 1X 27. Proposition 22's plain language simply says nothing about the "yardstick" or "levy" scenario posed by this fourth statute in section 33692. The language of Proposition 22 constrains the Legislature from requiring "a community redevelopment agency" from making certain allocations of its tax increment, either "directly or indirectly." (Cal. Const., art. XIII, § 25.5, subd. (a)(7)(A).) Proposition 22 does not address a local "legislative body" nor does it address in any respect the use of otherwise unrelated local revenue to pay a "levy" on tax increment funds.

Even a liberal construction of Proposition 22 yields no different conclusion. The only possible ambiguity in the relevant language concerns the use of the word "indirectly," but that word is bound to the otherwise precise transitive verbs, "pay," "remit," "loan," and "transfer," all of which are bound to the subject, "a community redevelopment agency," and the constitutionally protected object, tax increment funds. Simple rules of grammar, therefore, necessarily limit how liberally we may construe the word "indirectly." (Civ. Code, § 13; *Busching v.*

15

*Superior Court* (1974) 12 Cal.3d 44, 52 ["ordinary rules of grammar" normally "must be applied unless they lead to an absurd result"].)  Therefore, the word "indirectly" in plain language prohibits any compulsion being placed on a redevelopment agency to make certain reallocations (not levies) of its tax increment funds (but not other sources of local revenue).

As petitioner California Redevelopment Association conceded at oral argument, there are several sources of local revenues not protected by either Proposition 1A or Proposition 22, including, among other things, rental income, lease income, interest income, sales of government-owned assets, sales of bonds, investment income, and fines, fees, and penalties.  Given that such revenues bear no relation to any financing received by a redevelopment agency, it seems impossible to conclude on a facial challenge, as the majority does, that Assembly Bill 1X 27 payments funded by these revenues could ever cause a redevelopment agency to indirectly transfer tax increment funds already allocated to it.

Certainly, as previously described, a liberal construction of the word "indirectly" can be applied to prohibit the first three statutes of the 2009 ERAF legislation because they each contained mandates directed at redevelopment agencies and either directly targeted agencies' tax increment funds or indirectly targeted their tax increment funds by assigning the ERAF shift as indebtedness payable from the redevelopment agency's revenue sources.  Sections 33690 through 33691 express the premise that the ERAF remittances must come from the redevelopment agency, and, to the extent they do not, the nonpayment becomes part of the redevelopment agency's debt.  In fact, the legislation specifically defines a redevelopment agency's preexisting debt as redevelopment agency payments that have to be made, *directly or indirectly*, out of tax increment funds. Further, the 2009 ERAF legislation asserts that the ERAF remittances were intended to *directly or indirectly* further redevelopment projects within the

16

meaning of article XVI of the Constitution. Accordingly, article XVI, section 25.5, subdivision (a)(7)(A) of the Constitution, as enacted by Proposition 22, is completely responsive to the circumstances contemplated by sections 33690 through 33691 by prohibiting the Legislature from requiring "a community redevelopment agency . . . to pay, remit, loan, or otherwise transfer, directly or indirectly, taxes on ad valorem real property and tangible personal property allocated to the agency pursuant to Section 16 of Article XVI [i.e., its tax increment funds]."

But the fourth statute — section 33692 — poses an entirely different scenario, one that does not require a redevelopment agency to do anything, let alone require it to reallocate its tax increment funds, either directly or indirectly. It contemplates a situation not addressed by Proposition 22, even under a broad construction of that measure. Nevertheless, simply because section 33692 has an analog in Assembly Bill 1X 27 in the form of section 34194.l,[9] the majority hastily concludes that Proposition 22 prohibits similar levies on tax increment funds. The plain language, however, of section 25.5, subdivision (a)(7)(A) of article XIII of the California Constitution, as enacted by Proposition 22, does not support such a conclusion, even when liberally construed.

The majority criticizes my reliance on the grammar and syntax of Proposition 22 and cites our decision in *Burris v. Superior Court* (2005) 34 Cal.4th 1012 (*Burris*) for the notion that the normal rules of grammar must yield to the drafters' intent " 'to solve human problems' " and that we should approach

---

[9] Like section 33692 from the 2009 ERAF legislation, section 34194.1 likewise explains that the Assembly Bill 1X 27 payments can be funded from any available city or county "funds not otherwise obligated for other uses." (§ 34194.1, subd. (a).)

17

" 'an interpretive problem not as if it were a purely logical game, like a Rubik's Cube, but as an effort to divine the human intent that underlies the statute.' " (*Id*. at p. 1017, quoting *J.E.M. AG Supply v. Pioneer Hi-Bred* (2001) 534 U.S. 124, 156 (dis. opn. of Breyer, J.).) Placing aside the fact that the quote originally came from a dissenting opinion by Justice Breyer that had nothing to do with rules of grammar or syntax,[10] any exception to the rules of grammar or syntax might have some justification if we have been presented with the same scenario we faced in *Burris*, where the disputed language "could readily refer" to two different circumstances, and the legislative history of the measure supplied no "evidence the Legislature chose a particular construction in order to implement one rule or the other." (*Burris v. Superior Court*, *supra*, 34 Cal.4th 1012, 1018.) But as I have already explained, the relevant language of Proposition 22 is hardly ambiguous, and, to the extent that it is ambiguous, any ambiguity cannot be stretched to give the meaning the majority now assigns to it.[11]

The only way the majority's interpretation of Proposition 22 could be reconciled with its conclusion that it renders Assembly Bill 1X 27 unconstitutional would be if Proposition 22 had been written with a different subject and a different object, stating that the Legislature shall not: "Require a ~~community redevelopment agency~~ <u>local government body</u> . . . to pay, remit, loan, <u>levy</u> or

---

[10]    Instead, Justice Breyer used this language as a reason to take exception to "interpretive canon that disfavors repeal by implication." (*J.E.M. AG Supply v. Pioneer Hi-Bred*, *supra*, 534 U.S. 124, 155 (dis. opn. of Breyer, J.).)

[11]    More importantly, even ignoring the measure's actual language, in part II.C.2., I will explain that the drafters' express intent behind Proposition 22 does not support the majority's broad "human intent" interpretation, but instead is entirely consistent with the measure's plain language. Thus, my reliance on the syntax and grammar of Proposition 22 is but one additional reason, among others, that causes me to depart from the views of my colleagues.

18

otherwise transfer, directly or indirectly, <u>funds based on</u> taxes on ad valorem real property and tangible personal property allocated to ~~the~~ <u>its redevelopment</u> agency pursuant to Section 16 of Article XVI to or for the benefit of the State, any agency of the State, or any jurisdiction . . . ." But Proposition 22 was not written that way. If the proponents of Proposition 22 had intended to preclude a future version of section 33692, the fourth statute in the 2009 ERAF legislation and its catch-all allowing a "local legislative body" to make remittances on behalf of the redevelopment agency by using "any funds that are legally available for this purpose," they had every opportunity to draft such language, but they did not. Therefore, the plain language of Proposition 22 does not cover a section 33692 scenario, in which a city, county, or other local government body makes the payment described by Assembly Bill 1X 27, nor can it properly be "liberally construed" as doing so.[12]

---

[12]     In a footnote (maj. opn., at p. 41, fn. 20), the majority claims that my interpretation would not prohibit the Legislature from implementing in the future any of the same statutes that were part of the 2009 ERAF legislation as long as it also was accompanied by the fourth statute containing a catch-all option not expressly prohibited by Proposition 22.  This contention misconstrues both the precise language of the 2009 ERAF statutes and the nature of facial challenges to an individual statute.  As previously described, on their face, the first three statutes of the 2009 ERAF legislation are not "options," and each contains mandatory language prohibited by Proposition 22.  Because these three statutes either *require* the redevelopment agency to remit its tax increment funds or *require* loans to be backed by its tax increment funds, then their future iterations would be facially barred under Proposition 22.  By itself, any future iterations of the fourth catch-all statute, section 33692, would never pose a problem of facial unconstitutionality as measured against Proposition 22, because it is the only one of the four statutes that truly presents an "option" under its plain language.

19

## 2. *The History of Proposition 22*

In some circumstances involving constitutional amendments, "[t]he literal language of enactments may be disregarded to avoid absurd results and to fulfill the apparent intent of the framers. [Citations.]" (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 245.) Proposition 22, however, does not present such circumstances.

Nothing in the history of Proposition 22 suggests that its plain language must bend to some greater intention to shield tax increment funds from being used as a mere yardstick or "levy" for certain ERAF payments or that to hold otherwise would generate an absurd result. Uncodified sections of Proposition 22 refer to protecting against the reallocation of tax increment funds in a manner not more expansive than, and entirely consistent with, the language it enacted in article XIII, section 25.5, subdivision (a)(7)(A) of the state Constitution. (Prop. 22, Gen. Elec. (Nov. 2, 2010) §§ 2, subd. (d)(3) [noting that the Legislature has previously "[t]aken local community redevelopment funds on numerous occasions"], 9 [asserting that the "[t]he Legislature has been illegally circumventing Section 16 of Article XVI in recent years by requiring *redevelopment agencies to transfer a portion* of those taxes for purposes other than the financing of redevelopment projects" (italics added)].) Nothing in Proposition 22's history suggests that a broader reading — one that applies to and prohibits other entities' legislative bodies, or community sponsors, being compelled to make certain ERAF payments or prohibits using tax increment funds as a "levy" or yardstick to measure the size of those payments — is required. Nor is this result absurd because the plain language of section 25.5 (a)(7)(A) in article XIII of the California Constitution, as enacted by Proposition 22, fully encompasses the clearly stated purpose of Proposition 22 — "to prohibit the Legislature from requiring, after the taxes have been allocated to a redevelopment agency, the redevelopment agency to transfer

20

some or all of those taxes to the State, an agency of the State, or a jurisdiction; or to use some or all of those taxes for the benefit of the State, an agency of the State, or a jurisdiction." (Prop. 22, § 9.) Proposition 22 succeeds in ensuring that a redevelopment agency's largest source of revenue, the tax increment, cannot be reallocated by the state.

Nor does anything in the history of Proposition 22 suggest that its plain language must be construed to accommodate any hypothesized intention to protect *all conceivable local government revenues* or that to hold otherwise would generate an absurd result. Although uncodified sections of Proposition 22 complain that "state politicians in Sacramento have seized and borrowed billions of dollars in local government and transportation funds" (Prop. 22, § 2, subd. (c)) and broadly state that "[t]he purpose of this measure is to conclusively and completely prohibit state politicians in Sacramento from seizing, diverting, shifting, borrowing, transferring, suspending, or otherwise taking or interfering with revenues that are dedicated to funding services provided by local government or funds dedicated to transportation improvement projects and services" (*id*., § 2.5), the actual express limits that Proposition 22 imposes on the Legislature are quite discrete.

In addition to its language protecting tax increment funds, Proposition 22 provides that "[t]he Legislature may not reallocate, transfer, borrow, appropriate, restrict the use of, or otherwise use the proceeds of any tax imposed or levied by a local government solely for the local government's purposes." (Cal. Const., art. XIII, § 24, subd. (b), as added by Prop. 22, Gen. Elec. (Nov. 2, 2010) § 3.) Thus, Proposition 22 protects local taxes specifically earmarked for local government purposes. It also prohibits the Legislature from borrowing from certain funds related to transportation programs, reduces or eliminates the Legislature's authority to change the distribution of state fuel taxes and vehicle license fees, and

21

ends the Legislature's ability to order temporary ERAF loans of local property taxes during state financial hardships. (Prop. 22, §§ 4-7.)

The majority broadly concludes that Proposition 22 was drafted with the intent of ending ERAF shifts similar to those that had occurred before, but this history of Proposition 22 does not allow us to paint with such a broad brush. Although the majority assumes the drafters of Proposition 22 and the voters who endorsed it must have intended to preclude the kinds of ERAF shifts that had taken place since 2003, it is noteworthy that the term "ERAF" appears nowhere in either the voter guide or the text of the measure itself and that it is only vaguely referenced as to redevelopment agencies in the Legislative Analyst's summary of Proposition 22. (Voter Information Guide, Gen. Elec. (Nov. 2, 2010) Legis. Analyst's analysis of Prop. 22, p. 33 ["Recently, the state required redevelopment agencies to shift $2 billion of revenues to schools over two years"].) Nor was there any explanation of how the prior ERAF shifts were both revenue and source neutral. To the extent these materials explicitly refer to state-mandated shifts of local revenues to schools, the materials were precise as to Proposition 22's intentions — it prevents compelling a redevelopment agency to use its tax increment funds to make future payments to schools and it ends the state's ability to take loans of local property taxes to make temporary payments to schools in state fiscal emergencies.

Proposition 22's language and history evince nothing more, yet the majority somehow concludes that the drafters of Proposition 22 fully informed the voters that the measure carried the intent of precluding every previously expressed method of funding the prior ERAF shifts. But what part of Proposition 22, in either its history or codified its language, informed voters that the measure intended to also protect "any funds that are legally available for" funding future ERAF payments? (§ 33692, subd. (c).) By assuming such an intended protection,

22

the majority broadly conflates the circumstances leading to Proposition 22's placement on the ballot with the clear expressed intent of its drafters as documented in both its history and its codified language.

Given the specificity with which Proposition 22 expressly curtails the Legislature's ability to seize and/or borrow local government revenue, it is far more reasonable to conclude that Proposition 22 was narrowly intended to protect specific local government revenues and not, expansively, to cover "any funds that are legally available for" funding the Assembly Bill 1X 27 payments. (§ 33692, subd. (c).) More important, it would be improper to rely upon uncodified sections of Proposition 22 to support an unspoken intent to preclude the use of any otherwise available local funds to make the payments required by Assembly Bill 1X 27. (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562 ["Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history"].) Indeed, it would be an absurd result if we interpreted Proposition 22 to protect *all conceivable local revenues* in light of its otherwise clear language discretely isolating specific local revenue sources for protection.

Finally, I note that, in many ways, the payments described by Assembly Bill 1X 27 are not inconsistent with Proposition 22's expressly stated intent to prevent "[s]tate raids of revenues dedicated to funding vital local government services and transportation improvement projects and services." (Prop. 22, Gen. Elec. (Nov. 2, 2010) § 2, subd. (b).) The statutes governing Assembly Bill 1X 27 payments for every fiscal year after 2011-2012 provide that the payments are directed solely toward fire, transit, and school districts within the redevelopment project area. (§§ 34194, subds. (a), (c), 34194.1, subds. (b), (c), 34194.4, subds. (a)-(c).) In particular, the portions of Assembly Bill 1X 27 payments used to fund schools in the redevelopment project area are made in addition to any

23

funding provided to those schools by the state, potentially resulting in more funding for schools in financially troubled areas. (§ 34194.1, subds. (b), (c).) Far from being a "raid" of local revenues dedicated to essential government services, it seems apparent the Legislature had in mind the needs of local communities when deciding how to best balance the continued benefits of redevelopment.

### D. Petitioners Fail to Show That Assembly Bill 1X 27 Conflicts with the Constitution "in the Generality or Great Majority of Cases"

Even assuming the broadest possible construction of Proposition 22 and applying the more lenient standard for facial challenges, petitioners have failed to provide evidence to support a finding that Assembly Bill 1X 27 is unconstitutional.

Petitioners provide declarations on behalf of only seven of California's 482 incorporated cities and only one of its 58 counties. Given such a small sampling, even if they all described identical inevitable conflicts between Assembly Bill 1X 27 and the state Constitution, this evidence would fail to establish a constitutional violation " 'in the *generality* or *great majority* of cases.' " (*Guardianship of Ann S.*, *supra*, 45 Cal.4th 1110, 1126.) This showing is insufficient to establish that Assembly Bill 1X 27 payments must come, either directly or indirectly, from redevelopment agencies' tax increment funds in the generality or great majority of cases.

Moreover, the declarations provided by petitioners actually show quite the opposite. The declaration from the executive director of the California Redevelopment Association explains that the tax increment funds of most redevelopment agencies are tied up with existing debt, and that, as a result, "many redevelopment agencies will be unable to fund the required [Assembly Bill 1X 27] payments." The great majority of the other declarants make similar statements about their respective redevelopment agencies. Only one declarant, Mayor Jean

24

Quan, City of Oakland, unequivocally states that her city "can make the Assembly Bill 1X 27 payment by utilizing its current property tax increment [funds] and all of its remaining reserves. . . ." If these declarations are accepted as true, then they suggest that neither community sponsors nor most redevelopment agencies will actually be compelled to use their tax increments funds to make the Assembly Bill 1X 27 payments and there is no violation of Proposition 22.

Thus, petitioners' own evidence defeats the very notion that Assembly Bill 1X 27 will compel a violation of Proposition 22 in the generality or great majority of cases. Given this lack of evidence, the best we can conclude is that it *could* be possible that the statutes enacted by Assembly Bill 1X 27 *might* cause some redevelopment agencies to waive their constitutional protections as they relate to tax increment funds. But such speculation on a facial challenge cannot render legislation unconstitutional.

This evidentiary failure is unsurprising given that counsel for petitioner California Redevelopment Association candidly admitted at oral argument that his clients' worst case scenario would be a world where Assembly Bill 1X 26 is found constitutional and Assembly Bill 1X 27 is not. Implicit in that admission is the recognition that an overly broad interpretation of Proposition 22's protections would forever place petitioners' largest and most critical revenue source, tax increment financing, under lock and key. Given that we agree that, under Assembly Bill 1X 26, redevelopment agencies can be dismantled and their previously allocated tax increment revenue can be redistributed, how can they now ever be reconstituted and refinanced unless Assembly Bill 1X 26 itself is wholly reversed? The irony of these circumstances concerning Proposition 22 should not be ignored — the very measure that was crafted to protect financing for new redevelopment projects has been broadly interpreted in a manner that effectively

ends all financing for new redevelopment projects. This cannot be a necessary result intended by the proponents of Proposition 22 concerning redevelopment.

### III.    Conclusion

Given the procedural posture of this case, the rules of statutory and constitutional construction, and the nature of petitioners' burden of proof, I believe we cannot declare Assembly Bill 1X 27 unconstitutional in the manner articulated by the majority.

Although the system of redevelopment in this state has been far from perfect, it certainly is worth noting redevelopment projects like the restored Public Market Building in downtown Sacramento, the Bunker Hill project in downtown Los Angeles, Horton Plaza and the Gaslamp Quarter in downtown San Diego, HP Pavilion in San Jose, and Yerba Buena Gardens in downtown San Francisco. When faithfully administered and thoughtfully invested in the interests of the community, a redevelopment agency can successfully create jobs, encourage private investment, build local businesses, reduce crime and improve a community's public works and infrastructure.

A close reading of Assembly Bill 1X 27 indicates that the Legislature sought to preserve these benefits by carefully attempting to craft legislation that did not run afoul of our state Constitution. As noted earlier (see *ante*, pp. 23-24), it even sought to redress some of the inequity the prior system had created by funneling additional money into schools and fire and transit districts within each redevelopment project area. (§§ 34194, subds. (a), (c), 34194.1, subds. (b), (c), 34194.4, subds. (a)-(c).) In advocating for the constitutionality of Assembly Bill 1X 27, the California Teachers Association and the state's largest school district, Los Angeles Unified School District, both point out that Assembly Bill 1X 27 would provide schools with an additional $340 million per year, beginning with

26

every fiscal year following 2011-2012.  But today, the Legislature's attempt to balance the benefits of continued redevelopment with the need to fund vital local government services has apparently failed with little or no alternative to continued redevelopment available.

For the reasons set forth above, I conclude that petitioners fail to establish that Assembly Bill 1X 27 is unconstitutional on its face.


CANTIL-SAKAUYE, C. J.

27

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** California Redevelopment Association v. Matosantos

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**  XXX
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S194861
**Date Filed:** December 29, 2011

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Howard Rice Nemerovski Canady Falk & Rabkin, Steven L. Mayer and Emily H. Wood for Petitioners.

Richards, Watson & Gershon, Sayre Weaver, Steven R. Orr, Toussaint S. Bailey and Andrew J. Brady for the Association of Bay Area Governments and Various California Cities and Redevelopment Agencies as Amici Curiae on behalf of Petitioners.

Carmen A. Trutanich, City Attorney (Los Angeles), Kelly Martin, Assistant City Attorney; Kane, Ballmer & Berkman, Murray O. Kane, Susan Y. Cola and Donald P. Johnson for Community Redevelopment Agency of the City of Los Angeles, Southern California Association of Non-Profit Housing and Betty Yee as Amici Curiae on behalf of Petitioners.

Rutan & Tucker, William M. Marticorena, Philip D. Kohn, Jeffrey T. Melching, Bill Ihrke and Jennifer Farrell for City of Irvine as Amicus Curiae on behalf of Petitioners.

Rutan & Tucker, Jeffrey M. Oderman, Dan Slater, Mark J. Austin, Bill Ihrke and Megan K. Garibaldi for City of Cerritos, Cerritos Redevelopment Agency, City of Carson, Carson Redevelopment Agency, City of Commerce, Commerce Community Development Commission, City of Cypress, Cypress Redevelopment Agency, City of Downey, Community Development Commission of the City of Downing, City of Lakewood, Lakewood Redevelopment Agency, City of Paramount, Paramount Redevelopment Agency, City of Placentia, Redevelopment Agency of the City of Placentia, City of Santa Fe Springs, Community Development Commission of the City of Santa Fe Springs, City of Signal Hill, Signal Hill Redevelopment Agency, Cuesta Villas Housing Corporation and Bruce W. Barrows as Amici Curiae on behalf of Petitioners.

Wallin, Kress, Reisman & Kranitz, Peter J. Wallin; Law Offices of Robert V. Wadden, Jr., and Robert V. Wadden, Jr., for Long Beach Central, West and North Project Area Committees as Amici Curiae on behalf of Petitioners.

**Counsel:**

Michael W. Rawson, Deborah Collins, Craig Castellanet, Roland Chang, Ilene J. Jacobs, Mona Tawatao, Shashi Hanuman, Remy De La Peza, Richard Rothschild and S. Lynn Martinez for the Public Interest Law Project, California Rural Legal Assistance, Inc., Legal Services of Northern California, Public Counsel and Western Center on Law & Poverty as Amici Curiae on behalf of Petitioners.

Pamela J. Walls, County Counsel, and Anita C. Willis, Deputy County Counsel, for County of Riverside as Amicus Curiae on behalf of Petitioners.

Jean-Rene Basel, County Counsel, and Michelle D. Blakemore, Chief Assistant County Counsel, for County of San Bernardino as Amicus Curiae on behalf of Petitioners.

Woodruff, Spradlin & Smart, M. Lois Bobak and Thomas F. Nixon for Association of California Cities-Orange County as Amici Curiae on behalf of Petitioners.

Kamala D. Harris, Attorney General, Manuel M. Medeiros, State Solicitor General, Douglas J. Woods, Assistant Attorney General, Peter A. Krause, Seth E. Goldstein and Ross C. Moody, Deputy Attorneys General, for Respondents Ana Matosantos, as Director of the California Department of Finance, and State Controller John Chiang.

Miguel Márquez, County Counsel, Orry P. Lorb, Assistant County Counsel, Lizanne Reynolds and James R. Williams, Deputy County Counsel, for Respondents Vinod K. Sharma, Auditor-Controller of the County of Santa Clara and the County of Santa Clara.

Miguel Márquez, County Counsel (Santa Clara), Lori E. Pegg, Assistant County Counsel, Lizanne Reynolds and James R. Williams, Deputy County Counsel, for Santa Clara Unified School District as Amicus Curiae on behalf of Respondents.

Remcho, Johansen & Purcell, Karen Getman and Margaret R. Prinzing for California's Teachers Association as Amicus Curiae on behalf of Respondents.

Catherine A. Rodman for Affordable Housing Advocates as Amicus Curiae on behalf of Respondents.

Bell, McAndrews & Hiltachk, Thomas Hiltachk and Ashlee N. Titus for California Professional Firefighters as Amicus Curiae on behalf of Respondents.

Law Office of Christopher Sutton and Christopher Sutton for Municipal Officials for Redevelopment Reform and Assembly Member Chris Norby as Amici Curiae on behalf of Respondents.

David Holmquist, John F. Walsh; Strumwasser & Woocher, Gregory G. Luke, Byron F. Kahr; and Abe Hajela for Los Angeles Unified School District and California School Board Association as Amici Curiae on behalf of Respondents.

John C. Eastman, Anthony T. Caso and Karen J. Lugo for Center for Constitutional Jurisprudence and California Alliance to Protect Private Property Rights as Amici Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Steven L. Mayer
Howard Rice Nemerovski Canady Falk & Rabkin
Three Embarcadero Center, 7th Floor
San Francisco, CA  94111-4024
(415) 434-1600

Ross C. Moody
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-1376

James R. Williams
Deputy County Counsel
70 West Hedding Street, East Wing, 9th Floor
San Jose, CA  95110
(408) 299-5900